[Civ. No. 35721. First Dist., Div. One. Sept. 28, 1976.]

DONALD SIMMONS, Plaintiff and Appellant, v.
SOUTHERN PACIFIC TRANSPORTATION COMPANY et al.,
Defendants and Appellants.

## Counsel

Hurd, Meyer, Mitchell & Kaufman, Irving J. Hurd, Jr., and Jackson E. Morrison for Plaintiff and Appellant.

Knox, Ricksen, Snook, Anthony & Robbins, Corrigan & Stephenson and Douglas E. Stephenson for Defendants and Appellants.

## Opinion

**BRAY, J.**\*—Defendants Southern Pacific Transportation Company and Joseph M. Murphy appeal from judgments of the Contra Costa County Superior Court after jury verdict in favor of plaintiffs Donald Simmons and Mary Jane Fernie. Plaintiff Donald Simmons appeals on the limited issue of the failure of the said superior court to instruct on punitive damages.

### Issues Presented

*Defendants' appeal.*

1. Plaintiffs' counsel was guilty of prejudicial misconduct.

2. The court erred in instructing on the doctrine of wilful misconduct.

3. The court properly instructed on Public Utilities Commission General Order No. 75-B.

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

4. Testimony concerning the failure of railroad employees, generally, to give accident statements to California Highway Patrol officers was irrelevant and immaterial.

5. Testimony concerning a prior vehicular accident at the same crossing was irrelevant.

6. Much of witness Gardner's testimony was irrelevant and immaterial and prejudicial.

7. Evidence of a subsequent accident at the crossing was admissible.

8. Southern Pacific's motion to take judicial notice of certain judicial proceedings must be denied.

*Plaintiff Simmons' appeal.*

9. The court did not err in failing to instruct that the jury could award punitive damages.

## RECORD

On April 15, 1970, plaintiffs Donald Simmons and Mary Jane Fernie, heir of Allen Christian, deceased, filed a complaint for damages in the Contra Costa County Superior Court against defendants Southern Pacific Transportation Company (Southern Pacific) and Joseph M. Murphy. A jury found for plaintiffs and against defendants assessing damages for Simmons in the sum of $225,000 and for Fernie in the sum of $22,500. Judgment on the verdicts was entered. Defendants' motion for a new trial was denied.

Defendants filed timely notice of appeal. Plaintiff Simmons filed timely notice of appeal on the limited issue of the failure to instruct on the issue of punitive damages.[1]

## FACTS

The accident which is the subject of this case occurred on April 24, 1969, at a railroad crossing, referred to herein as the Dowrelio crossing,

---

[1]The notice of appeal states that plaintiff Fernie also appeals. However, on December 24, 1971, Fernie dismissed the allegations contained in the complaint relating to punitive damages. The briefs name only Simmons as appellant.

which is in an unincorporated area of Contra Costa County near the Town of Crockett.

On the morning of the day of the accident, Donald Kittilstad, Allen ("Waldo") Christian, and plaintiff Simmons went to Dowrelio Boat Harbor (hereinafter Dowrelio's) to work on Kittilstad's boat. At approximately 5 p.m. they went to the restaurant and bar at Dowrelio's. They left approximately an hour later. Kittilstad walked 10 to 20 feet ahead of his companions toward his automobile. It was necessary to cross 4 sets of railroad tracks in order to get to the car. Kittilstad proceeded across the tracks. When Simmons was "A good full step" from the track, he looked to the left and saw a train about 400 feet away approaching them. He said, "Look out, Waldo, there's a train." Christian, who turned to look to the left, stepped into a hole and fell forward on the tracks. Simmons attempted to pull Christian from the tracks. He was successful in pulling Christian's foot out of the hole but was unable to pull him from the path of the train. The train struck both men, killing Christian and severely injuring Simmons whose arm was eventually amputated as a result of the injuries sustained. Plaintiff Simmons testified that when he first saw the train 300 to 400 feet away he and Christian were in a position of safety. A witness, William Bond, testified that he was seated in his parked car at the east end of the parking lot. He heard the train "whistling down the track" as the plaintiffs approached the parking lot. At a point when the train was just about in front of him, Bond said the plaintiffs began to run and he thought to himself, "Don't try it because the train's too close." They ran approximately 10 feet or "two or three steps" when Christian fell on the tracks. By that time the train had nearly reached the crossing.

Both Kittilstad and Simmons testified that the train did not blow its whistle until at about the point of impact. Mr. Bond did not specify the distance but stated that he heard the train come "whistling down the track" and that it whistled as it came closer. Charles Schmelz, who lived in a trailer near the Galley, testified that he was in the trailer and he heard the train whistle; that he went to his front trailer window and looked out and saw two men, one of whom was on the ground, and they were on the railroad crossing area. Mrs. Vicki Clinkenbeard heard the train whistle from "far off." Antone Dowrelio heard a frantic warning-type whistle.

Joseph Murphy, the engineer of the train that struck the men, was proceeding from Roseville to Oakland. Murphy testified that when the

train came around the curve approximately one-fourth of a mile from the Dowrelio crossing, he was traveling at 43 miles per hour. He stated that he commenced to blow the train's whistle in a warning blast when the train was one-fourth of a mile in advance of the crossing and that he turned the train's bell on at the same time. There were railroad cars parked on the adjoining tracks. When he cleared the cars on his right side, he saw two people on the crossing approximately 30 feet from the track on which he was traveling. He was not sure if they were aware of his presence. He was sounding the warning blast and then proceeded to give a succession of sharp, loud blasts. When he saw the men crossing in front of the train and saw one man fall, he went into an emergency application of the brakes. At this point he was, according to his estimate, about a car-and-a-half from the crossing and there was no hope of stopping the train.

Antone Dowrelio subleased the present site of the harbor facilities in 1929 from the C & H Sugar Company and built a wharf on the premises. Dowrelio negotiated a lease with Southern Pacific for use of the railroad track crossing and parking lot on the other side of the crossing. The business grew and from about 1947 to 1969 approximately 4,000 to 5,000 people a month used the facilities. Dowrelio estimated that at the time of the trial at least 50 to 75 trains per day passed through the crossing and more than 200 trains per day passed through the crossing during the periods of heavy use. In 1963 the crossing was closed to vehicular traffic after an official of Southern Pacific witnessed a near collision of a train and gasoline truck. The closing was accomplished by means of posts and a chain stretched between the posts. Southern Pacific then relented to allow the passage of emergency and delivery vehicles over the crossing. Whenever it was necessary to allow the passages of such vehicles, Southern Pacific provided a flagman to protect the crossing and vehicle from railroad traffic. At the time of the accident, the harbor complex consisted of a fishing club with approximately 225 members, a restaurant, a boat repair yard, a Sea Scout meeting building and a boat marina. Persons using these facilities had to use the Dowrelio crossing.

Between 1947 and the time of the accident, Southern Pacific repaved the surface three times. Although Dowrelio's occasionally effected minor repairs, the maintenance work on the crossing was performed by and considered to be the responsibility of Southern Pacific. A waitress employed at the restaurant at the time of the accident testified that during the time of her employment there were holes in the asphalt

walkway over the crossing which one had to walk around. Kittilstad, who witnessed the accident, stated that at the time of the accident there were potholes in the asphalt and that Christian's foot was caught in one of these holes. Subsequent to this accident another accident occurred involving a woman whose shoe caught in a hole in the asphalt, causing her to trip and fall.

At the time of the accident there were no protective or warning devices at the crossing.

Plaintiffs introduced evidence tending to show that defendant Southern Pacific instituted a regular office procedure whereby files relating to grade crossings were stripped of documents unfavorable to the railroad. A letter dated March 4, 1969, from Burton R. Howard, general claims manager of Southern Pacific, to several claims personnel was introduced into evidence. The letter reads in part: "I am sure all of you are aware of the special committee which has been functioning under the direction of Messrs. Still and Hoyt in an effort to provide direct communication between all departments and a mutual effort in solving some of the major problems confronting us. [¶] The efforts of this committee in eliminating unnecessary correspondence files which relate to the upgrading of crossing protection have been most successful. The discontinuance of such files, particularly in the office of Mr. H. M. Williamson, will require that you look to your Division Engineer for any desired information as to the status of crossing protection at any given crossing. It is desired that such inquiries be made in person or by telephone, consistent with our program of eliminating as much correspondence as possible in this regard."

Elden M. Gardner, who had been employed by Southern Pacific from 1958 until 1971, worked in the claims department headed by Howard from 1964 until the time he left the employ of Southern Pacific. One of his primary functions was the investigation of crossing accidents. Gardner's supervisor, H. L. Hardin, was one of the persons to whom Howard's letter was addressed. Gardner testified that his instructions were to review the file of a crossing where there had been an accident and to tab any material which could be interpreted as notice detrimental to the railroad. He would then turn the file over to Hardin whose responsibility it was to remove the material from the file. In the file pertaining to the Dowrelio crossing there was no report of two other

accidents at the crossing, evidence of which accidents was admitted at the trial.

*Defendants appeal.*

1. ▉ Plaintiffs' counsel was guilty of prejudicial misconduct.

Defendants contend that plaintiffs' counsel, Mr. Hurd, was guilty of prejudicial misconduct. In support of their contention, defendants cite numerous instances of alleged misconduct which, they claim, deprived them of a fair trial. ▉ The ultimate determination of this issue rests upon this court's "view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances." (*Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 321 [74 Cal.Rptr. 534, 449 P.2d 750].)

▉ A study of the record shows that plaintiffs' counsel from the very beginning of the trial embarked on a campaign of hate, vilification and subterfuge for the sole purpose of prejudicing the jury against defendant Southern Pacific and its employees. Plaintiffs' counsel's conduct appears to have been actuated by a fear that unless he treated the defendant as harshly as possible he would lose the lawsuit. Among the many instances of unfair conduct by plaintiffs' counsel are the following.

Mr. Hurd told the jury that "if these people would lie and cheat and steal and thieve as they do, if they will elicit and suggest perjury, and when they get caught, they go, 'So what?'" Following a sustained objection to this language Mr. Hurd said, "If it starts as high as the Vice-President or the President of the Head of the Legal Department, and *it's going to pervade through the system* . . . ."

He stated also that "They are awfully big, the Southern Pacific; they are almost as big as the State, . . . [T]hey don't care; they don't care from the very top, from—the Vice-President of Southern Pacific, Mr. Jaekle, stands there and tells you, 'No, I don't think pedestrians deserve that kind of protection; . . .' *let the pedestrian be damned in this situation.*" Again he stated, "[T]he thread that weaves its way down from the Vice-President to his brother, the Claims man, the thread that says it's okay to cheat, to lie, to steal, to deceive, it's okay.'

In the same line, Mr. Hurd stated, "[W]hen older people get struck down, that fits even more succinctly into the statistics of the railroad, because they know they don't have to pay the gigantic figures connected with the wage loss."

He also stated, "And I don't understand if perjury is a built-in part of a defense of a lawsuit, or what, but it just seems to pass unnoticed." Plaintiffs' counsel stated without the slightest bit of evidence, that Southern Pacific had moved the parked tank cars: "But I wouldn't put it past them."

Again emphasizing the size of defendant Southern Pacific, he asked, "Doesn't Southern Pacific own 323 million acres of land, sir?" The objection to this question was sustained. Counsel later asked, "[I]s it not a fact that there are 233 million acres of land owned by Southern Pacific? . . . And 68,000 acres . . . where there are office buildings?" Continuing in the same theme he again stated, "I am sure that, you know, that someplace somewhere in this broad land or maybe just within the 233 million acres there are these documents." Objection was sustained. Again Mr. Hurd stated, "[Y]ou say, 'Too bad, we're going to buy another ten million acres some place because that's a better place for our money." The court again sustained an objection.

Plaintiffs' counsel distinguished his position from that of the railroad's counsel stating that while he had a choice as to whether he would take plaintiffs' case, defendants' counsel Mr. Snook did not; that plaintiffs' counsel did not have someone come and say, "Here is this case; . . . it's a rough one; . . . do anything you can to hold down the damages." Objection was sustained. The court when asked to admonish merely stated, "Confine your remarks to answering Mr. Snook's argument, Mr. Hurd."

Mr. Hurd asked Mr. Bond, a witness for the railroad, if he had been drinking the day of the accident. He replied that he had not. Mr. Hurd then asked him, "[I]sn't it a fact that you didn't go up and talk to the police afterwards because you had alcohol on your breath?" Mr. Bond denied it. Mr. Hurd produced nothing to show that he was justified in asking the question. Mr. Hurd questioned Mr. Bond concerning Bond's drinking which led to his arrest on a day three years after the accident. Hurd presented a Wild Turkey whiskey bottle with a faked evidence tag on it obviously intending that the witness believe that the bottle was the bottle found in the witness' car when arrested when, in fact, as Hurd

admitted, it was not. The whole incident was not relative to anything connected with the accident. When questioned by the court concerning this cross-examination, Mr. Hurd promised to tie it in but he never did.

The court ruled that plaintiffs not project on the screen during summation any testimony not properly a part of the record. Despite the ruling plaintiffs' counsel showed the jury certain *in camera* testimony of the witness Gardner which had been excluded by the judge.

Mr. Hurd deliberately interrupted defendants' direct examination of a defense witness stating, "I want to upset . . . your train of thought, Mr. Snook."

Mr. Hurd asked a defense witness whether another individual who had resisted moving from one city to another did so because he "did not wish to move his family." The witness replied, "Sir, he didn't have a family." Mr. Hurd then asked, "Was he a bastard?" The witness: "Pardon?" Mr. Hurd: "I asked you if he was a bastard."

A witness stated, "I must read Mr. Schmalz's statement." Mr. Snook said, "I think it's Schmelz, not Schmalz." Thereupon, plaintiffs' counsel injected, "Snook, not Smook."

When a witness testified that a little lady had fallen, plaintiffs' counsel interrupted to state, "There was no 'little lady.' He is trying to paint this pedestrian as a little lady in tennis shoes."

Mr. Hurd suggested that if called to testify Neal Carter and Phil Dudo would testify that Southern Pacific had a systematic plan to eliminate incriminating matter from its files. Mr. Hurd failed to produce either man.

Mr. Hurd insinuated that a man named Stewart had given testimony admitting that he had knowledge of the moving of a boxcar involved in other litigation and then failed to produce him.

Concerning the removal of an overpass, plaintiffs' counsel said that reference to its removal was not in the file. Later he suggested that it was.

Mr. Hurd implied that one McDonald was a Southern Pacific employee charged with the responsibility for illicitly stripping files, yet

he did not produce McDonald nor any witness to testify concerning McDonald's alleged activities.

Although plaintiffs' counsel knew that a switch list would not reflect the position of parked tank cars on the track, he asked a witness, "You are aware, are you not, that a switch list . . . would reflect the position of cars related to crossings; correct?"

Plaintiffs' counsel began examining the Southern Pacific claims manager about testimony of someone else taken in another case in Arizona.

Counsel frequently got immaterial or purported facts before the jury by asking, "Isn't it true that" or "Did you know that."

He insinuated that "twenty-one citizens" had testified in another case to the fact that the railroad had moved a boxcar away from a crossing subsequent to an accident.

Mr. Hurd asked the Southern Pacific conductor who had worked with engineer Murphy who drove the train in the accident, "Were you the conductor in a previous injury accident that he had?" Objection to the question was sustained.

Plaintiffs' counsel, although he admitted on the record that he had no evidence that Southern Pacific had purged, stripped or otherwise tampered with the file in question, made charges that the railroad had done so.

Frequently plaintiffs' counsel would ask a question to which an objection would be sustained. Occasionally he would abide by the court's ruling and pursue some other line of inquiry. Frequently he would not. We have cited some of the instances in which he elected to pursue inquiries in the face of repeated objections. There were many more.

In addition, defendants contend that plaintiffs' counsel made improper arguments relating to damages. The court refused to instruct on punitive damages. Thereupon counsel told the jurors that they could not punish Southern Pacific because of "technicalities of the law." Plaintiffs' counsel stated to the jury, "[W]e're not permitted to punish the Southern Pacific; we can't say, you know, ten million dollars to teach a

lesson. But we can sure let them know that juries in this country are going to give the full value of a life, regardless of the technicalities of the law. I don't know whether you can be offended by that figure. I have absolutely no idea. But I do think that would be most offensive to Southern Pacific." Plaintiffs' counsel requested a form of punitive damages by suggesting the deterrent value of awarding a large verdict, 'If you compromise it, the message I'm trying to say is, it's going to keep happening and happening and happening, and you three years from now may be in here on another jury on the same case." Objection was sustained and the court asked to admonish. All the court said was, "Conclude your argument."

Some of these instances are of minor importance, but in their totality, together with the testimony of Mr. Gardner, whose testimony will be discussed later, made it impossible for Southern Pacific to have a fair trial.

Defense counsel objected to much of plaintiffs' counsel's actions and in some cases asked for admonitions. The court's admonitions, when given, were mostly inadequate. However, on many occasions objections were not made or if made admonitions were not asked. It is clear from the record that objecting would have overemphasized the objectionable material and would have alienated the jury who, because of plaintiffs' counsel's conduct, was unfavorably disposed against the defendants. ■ "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished." (*Horn* v. *Atchison, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].)

However, even in the absence of an objection and request for admonition, where there are flagrant and repeated instances of misconduct, an appellate court cannot refuse to recognize the misconduct.

A case very closely in point with respect to the similarity in quality of the misconduct seen in this case is *Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183], a medical malpractice and drug case against a treating doctor and Parke-Davis and Company. Following a substantial verdict against both defendants, an appeal was taken—primarily on the ground that plaintiff's attorney had been guilty of outrageous misconduct. The Court of Appeal agreed, concluding that he had been guilty of

prejudicial, "egregious" misconduct from the opening day of trial to its conclusion. Included in a long list of instances of misconduct (almost all of which were directed at Parke-Davis) were the following: (1) references to Parke-Davis' earnings; (2) false references to its profits on those earnings; (3) repeated use of "Do you know that" type questions " 'designed not to obtain information or test adverse testimony but to afford cross-examining counsel a device by which his own unsworn statements can reach the ears of the jury and be accepted by them as proof. . . ' " (*Love* v. *Wolf, supra,* at p. 390, quoting *People* ex rel. *Dept. of Public Works* v. *Lillard* (1963) 219 Cal.App.2d 368, 379 [33 Cal.Rptr. 189]); (4) unkept promises to prove the facts suggested by innuendo and insinuation; (5) verbal abuse of opposing counsel; and (6) suggestions as to subornation of perjury by opposing counsel. Some of the alleged misconduct had been properly objected to, and on other occasions objections had not been made. Nevertheless, the court reversed and remanded for a new trial—despite its conclusion that there was "substantial evidence" of medical negligence on the part of the doctor (and less against Parke-Davis). The court held that notwithstanding the apparent negligence of the doctor, plaintiff's counsel's misconduct had denied him a fair trial, and that therefore, he was owed the benefit of the doubt. The court said, " '. . . [I]t cannot be stated with certainty that all of this would have changed the result of the case. But, as said by the Supreme Court, a litigant who had engaged in misconduct is not entitled to "the benefit of calculation, which can be little better than speculation, as to the extent of the wrong inflicted upon his opponent." ' " (*Love* v. *Wolf, supra,* at p. 394, quoting *Seaboldt* v. *Pennsylvania Railroad Company* (3d Cir. 1961) 290 F.2d 296, 300.) With respect to plaintiff's contention that defendants had waived their right to complain about the misconduct by not always objecting to it, the court pragmatically dismissed the objection, saying: "As any experienced trial lawyer knows, multiple objections have a tendency to alienate a jury's good will; particularly when, as in this case, the judge fails to rule on the objections made. *And here many instances of misconduct were objected to. As for curing error by admonishing a jury, while this may be possible when error is isolated and unemphasized, an attempt to rectify repeated and resounding misconduct by admonition is, as counsel here has expressed it, like trying to unring a bell.*" (*Love* v. *Wolf, supra,* at p. 392; italics added.)

In *Hoffman* v. *Brandt* (1966) 65 Cal.2d 549 [55 Cal.Rptr. 417, 421 P.2d 425], the Supreme Court held that one of the attorney's references (during summation) to the respective financial conditions of the parties

was error: "Justice is to be accorded to rich and poor alike, and a deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case." (*Id.* at p. 553, citing *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, with approval.) Respondent conceded that his misconduct was error. He contended, however, that appellant's failure to request an admonishment constituted a waiver of the right to complain. Moreover, he said, the trial court *had* admonished the jury on its own motion, albeit in an equivocal manner. The Supreme Court disagreed, saying that when an attorney makes reference to a party's financial condition "in any personal injury case . . . although an admonition may to some extent reduce the prejudice due to improper reference to defendant's ability to meet a judgment, it will not totally eliminate the prejudice." (*Hoffman* v. *Brandt, supra,* at pp. 553-554.) Moreover, the court was persuaded by the fact that the question of liability was very close. Accordingly, it reversed and remanded for a new trial. It should be noted that the reference to the respective financial positions of the parties was the *only misconduct* committed in the trial.

In *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141 [45 Cal.Rptr. 313, 403 P.2d 721], the Supreme Court reversed a condemnation judgment on the ground that the plaintiff's lawyer had been guilty of misconduct; that defendants had been denied a fair trial as a result; and that the misconduct was sufficient to constitute a miscarriage of justice. Said the court: "[Plaintiff's attorney's] activities and remarks during the trial and in his summation to the jury were prejudicially erroneous. He conducted himself in a manner which is completely incompatible with the dignity and decorous conduct of a judicial proceeding. In achieving the introduction of certain evidence, in alluding to facts not in evidence, and in making certain representations of fact, he made promises of evidence to support or connect which he neglected to fulfill. He . . . resorted to insulting and derogatory characterizations of defendants . . . and sought by snide remarks and innuendo to impugn [their] motives and purpose . . . ." (*Id.* at p. 143.) The court conceded that there was substantial evidence—with or without the misconduct—to support the verdict. It held in effect, however (citing *Love* v. *Wolf, supra,* 226 Cal.App.2d 378), that if the misconduct is intentional and prejudicial, reversal is required, despite the existence of substantial evidence to support it. (*Garden Grove School Dist.* v. *Hendler, supra,* at p. 144.) In so ruling the court specifically noted that the defendants' attorney had

objected to only "*some* of the remarks and misconduct." (*Id*; italics added.)

In *Kenworthy* v. *State of California* (1965) 236 Cal.App.2d 378, 396-401 [46 Cal.Rptr. 396], the court reversed a judgment against the state for, among other reasons, gross and continuous misconduct of plaintiff's attorney—even though *proper objections and admonishments* had been made in almost every instance. The misconduct consisted of the following: (1) unfounded accusations of suppression of evidence by the state; (2) suggestions (not subsequently proved) of bribery of state officials; (3) self-serving statements in front of the jury; (4) improper attempts to introduce irrelevant evidence in the jury's presence; (5) gratuitous remarks made in front of the jury; and (6) arguments "replete with insinuations, none of which had any support in the record." After reviewing the foregoing misconduct the court stated: "In our opinion, the design and purpose of plaintiffs were clear. There was a deliberate attempt to administer poison, no single dose of which was lethal, but with an accumulative effect inevitable and realized." (*Id.* at p. 398.) The court concluded, therefore, that even though the trial court had admonished the jury to disregard the improprieties of counsel, and had felt in denying the state's motion for a new trial that "its admonitions had been an antidote sufficient to counteract the venom," the grossly excessive verdict was proof to the contrary. (*Id.* at p. 401.)

In *Balistreri* v. *Turner* (1964) 227 Cal.App.2d 236 [38 Cal.Rptr. 553], this court reversed a judgment in favor of the plaintiff (a union member) in a conspiracy/assault and battery action against a union official. After first concluding that sufficient evidence had been introduced to support the conspiracy theory, the court went on to hold, however, that the conduct of plaintiff's attorney required a reversal. The misconduct consisted of asking numerous argumentative and insinuating questions containing implicit assertions that the defendant was a union bully, dictator, etc. (See fn. 2 at pp. 242-243.) The court held that the failure of defendant "to assign each and every instance as misconduct and to request that the jury be instructed to disregard it" did not constitute a waiver in view of the fact that even when defendant's counsel did successfully object, such did not "deter respondent's counsel even momentarily from his apparent purpose of discrediting appellant in the eyes of the jurors and thereby trying him rather than the issues properly before the court." (*Id.* at pp. 244-245.)

In *Malkasian* v. *Irwin* (1964) 61 Cal.2d 738, 746-747 [40 Cal.Rptr. 78, 394 P.2d 822], the Supreme Court held that it was misconduct for an attorney to suggest inferences not supported by the record, or to assume facts not in evidence as the basis for argued inferences.

In *Weaver* v. *Shell Oil Co. of California* (1933) 129 Cal.App. 232, 234 [12 P.2d 167], plaintiff's counsel's statement in closing argument that " 'the Shell Company is a great big, rich corporation, has millions, . . .' " was held to be prejudicial misconduct.

In *Keena* v. *United Railroads* (1925) 197 Cal. 148 [239 P. 1061], the Supreme Court held that insinuations and unsupported accusations of wilful suppression of evidence constituted reversible misconduct.

In this case, the misconduct was such that admonishing the jury would not have unrung the bell.

2. ■ The court erred in instructing on the doctrine of wilful misconduct.

The court instructed that the jury could excuse plaintiffs' contributory negligence if the conduct of Southern Pacific and engineer Murphy demonstrated intentional wrongful conduct with knowledge that injury to the plaintiffs would probably result or with a wanton and reckless disregard of possible injury to them.

Defendants contend that the court erred in instructing the jury regarding wilful misconduct. The court instructed the jury as follows: "Contributory negligence of a plaintiff is not a bar to his recovery for an injury caused by the wilful or wanton misconduct of a defendant. [¶] Wilful or wanton misconduct is intentional wrongful conduct, done either with knowledge, express or implied, that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results. An intent to injure is not a necessary element of wilful or wanton misconduct. [¶] To prove such misconduct it is not necessary to establish that defendant himself recognizes his conduct as dangerous. [¶] It is sufficient if it be established that a reasonable man under the same or similar circumstances would be aware of the dangerous character of such conduct." The instruction was pursuant to BAJI Instruction No. 3.52 (1971 Re-revision).

The doctrine of wilful misconduct is well stated in *Morgan v. Southern Pacific Trans. Co.* (1974) 37 Cal.App.3d 1006, 1011-1012 [112 Cal.Rptr. 695]. There the court stated: " 'Wilful or wanton misconduct' travels under several other names. Its aliases include 'serious and wilful misconduct,' 'wanton misconduct,' 'reckless disregard,' 'recklessness,' and combinations of some or all of these. These terms are interchangeable because they all identify the same thing—'an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care' (Prosser, Law of Torts (4th ed. 1971), § 34, p. 184; see also 35 Cal.Jur.2d, Negligence, § 200, p. 722). 'The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' (Prosser, Law of Torts (4th ed. 1971) § 34, p. 185.) The wilful misconduct instruction given by the trial court in this case (BAJI No. 3.52) contains substantially the same wording as Prosser's formulation. The cases, treating the concept under one or another of its labels, define it substantially the same way. [Citations.] . . . [¶] Three essential elements must be present to raise a negligent act to the level of wilful misconduct: (1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril. (*Williams* v. *Carr,* 68 Cal.2d 579 [68 Cal.Rptr. 305, 440 P.2d 505]; *Olea* v. *Southern Pacific Co., supra,* 272 Cal.App.2d 261, 265 [77 Cal.Rptr. 332].)"

It is this court's task to determine whether there is substantial evidence in the record to support each of the foregoing elements.

With regard to the conduct of the engineer Murphy, plaintiffs contend that there was abundant evidence on the record indicating that Murphy "failed to blow his whistle until immediately prior to the impact and did not apply the train brakes until after the impact." Although Murphy testified that he commenced giving a warning blast one-quarter of a mile before the crossing, several witnesses did testify that the train's whistle was not blown until immediately prior to impact. While the engineer testified that he applied the brakes when he saw a man fall there was some evidence presented by experts that the brakes may have been applied after the impact. Although this is sufficient evidence of negli-

gence the question here is whether it can be said that this conduct constituted wilful or wanton misconduct.

In a recent case, *Bains* v. *Western Pacific R. Co.* (1976) 56 Cal.App.3d 902, 906-907 [128 Cal.Rptr. 778], the court stated: "With regard to Western Pacific's procedure of not applying the brakes unless a collision appeared imminent, as opposed to unavoidable, this again might be a basis for negligence, but not wilful misconduct. There are innumerable situations in which operators of trains, cars, and bicycles do not apply their brakes until a collision becomes imminent. This is due largely because one moving vehicle has, by law, the right-of-way over the other. If the law did not condone such action, every intersection, railroad crossing, and merging lane would become a 'yield the right-of-way' to every vehicle involved."

There was no evidence to support a wilful misconduct instruction. As to the engineer Murphy, there was no evidence to justify a finding that he demonstrated intentional wrongful conduct with knowledge that injury would probably result, nor that he showed a wanton and reckless disregard of possible injury to plaintiffs.

Nor was there evidence of any wilful misconduct on the part of Southern Pacific. There was no evidence that it knew of the defective condition of the walkway. The evidence was that Dowrelio would notify Southern Pacific when the roadway needed repair and that he had not done so. Moreover Dowrelio and his daughter testified that there never had been any slip and fall accidents on the pathway in all their years in the area. Moreover plaintiffs' amended complaint said nothing about any defect in the walkway. ■ A plaintiff asserting a cause of action for wilful misconduct must plead specific facts upon which the charge is based—or the particular facts upon which the wilful misconduct of a person is charged. (*Van Meter* v. *Reed* (1962) 207 Cal.App.2d 866, 870 [24 Cal.Rptr. 688]; *Snider* v. *Whitson* (1960) 184 Cal.App.2d 211, 214-215 [7 Cal.Rptr. 353].)

■ There was much conflicting testimony concerning when the whistle was blown. However, the train was seen at 300 to 400 feet. There was no evidence that engineer Murphy or Southern Pacific were or should have been aware of any pedestrian-related peril at the crossing.

3. ■ The court properly instructed on Public Utilities Commission General Order No. 75-B.

The trial court instructed that Southern Pacific's violation of Public Utilities Commission General Order No. 75-B[2] would constitute negligence and that if the violation was a proximate cause of injury to another it was to find that the violation was negligence unless "such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who had desired to comply with the law."

Defendants contend that the instruction was improper because General Order No. 75-B, as read to the jury, had been repealed by an order of the Public Utilities Commission (hereinafter Commission) dated December 17, 1968, several months prior to this accident.

In its order of December 17, 1968, the Commission found that the octagonal stop sign is the most effective sign to convey the stop message to the public and that the standard stop sign combined with a private crossing sign would best convey the total desired message to the public. The order refers to a drawing attached to it which depicts the combination of signs. Under the standard stop sign is a sign which depicts a railroad crossing and the words "PRIVATE CROSSING." In addition, the second sign states "NO TRESPASSING"—"RIGHT TO PASS BY PERMISSION SUBJECT TO CONTROL OF OWNER"—"SECTION 1008, CIVIL CODE." With regard to the lower sign, the Commission found, "The lower portion of the lower sign commencing with the words 'No Trespassing' contains language which should be permitted at the option of the railroad, but not required by the Commission."

Based on its findings the Commission ordered that the signs "are hereby authorized to be installed at private railroad grade crossings. Within two years from the effective date of this order, two such masts with signs shall be installed at each private railroad grade crossing not equipped with automatic protection, one facing each road approach, unless there is no space to locate the sign or signs." It further ordered, "The language contained in lower portion of the lower sign commencing with and including the words 'No Trespassing' shall be permitted at the option of the railroad, but shall not be required by the Commission."

Contrary to defendants' assertion that the new order made "private use only" signs optional, a sign indicating a private crossing continued to

---

[2]This order provided in pertinent part that "Each private road crossing at grade with a track of a railroad ... shall have a ... sign installed ... indicating that the crossing is for private use only and not for public use."

be required. The only optional language is the part commencing with and including the words, "No Trespassing." Furthermore, there is no express repeal of General Order No. 75-B and it is logical to assume that the Commission, in giving the railroads two years to comply with the new requirement, intended that the signs which it previously required remain in place until the new ones had been installed. Therefore, the court was not in error in giving the instruction.

4.  ■  Testimony concerning the failure of railroad employees, generally, to give accident statements to California Highway Patrol officers was irrelevant and immaterial.

It had already been established that *this crew* at *this accident* had cooperated and that the engineer had given a full statement to the California Highway Patrol. In fact, Southern Pacific's trainmaster even drove the highway patrol officer to the head of the train so the statement could be obtained.

The trial court permitted Mr. Hurd to question one of the investigating highway patrol officers about "more or less uniform responses from train crews [employer not specified] in train accidents to questions of investigating officers." The gist of the response was that they give only sketchy answers—because, the witness assumed, of "the civil liability aspect." This questioning came at a time when Southern Pacific's image had already been unjustifiably but severely tarnished, and the responses of the witness seemed to fit in with the cover-up, evidence-suppression theme being pushed by Mr. Hurd.

The entire line of inquiry was improper and prejudicial. It was not relevant that a Santa Fe, or Union Pacific, or other Southern Pacific crew might respond with more, or less, or different information.

5.  ■  Testimony concerning a prior vehicular accident at the same crossing was irrelevant.

The trial court permitted testimony concerning a 1962 accident between an automobile and a train at the same crossing to show "notice" to the railroad of a "serious visibility problem" at the crossing. Prior accidents may, when relevant, be admitted for this purpose. (*Gilbert* v. *Pessin Grocery Co.* (1955) 132 Cal.App.2d 212 [282 P.2d 148].) However, it must be established that the circumstances of the accidents are the same or similar.

In the 1962 accident the cars were parked very close to the crossing. The highway patrol reported the distance to be 59 feet. In this case plaintiffs admitted that the cars were almost three times that far. Despite the proximity of the parked cars in the earlier case, the driver there admitted to seeing the train come around the curve down by the C & H refinery. Then, *after* he saw the train, he decided to proceed in front of it and did so until the car stalled. When the car stalled, the driver got out and the train proceeded to run into it.

The 1962 accident would not have put the railroad on *notice* of anything except that a car had stalled on its tracks. The facts are entirely dissimilar and should not have been presented to the jury.

6. ■ Much of a witness' testimony was irrelevant and immaterial and prejudicial.

Witness Gardner had been Southern Pacific's Phoenix claims agent. When Southern Pacific decided to close that office Gardner was given the choice of either transferring to Tucson or Los Angeles. He declined either and was discharged. His attitude on the stand indicates that he felt bitter towards his former employer. He testified to participating in a "file-stripping" operation in which he would go through the General Manager's Order file in crossing accidents and tag all matters having potential liability significance. Thereafter his supervisor, Mr. Hardin, would remove any incriminating materials. Incidentally, Mr. Hardin denied this, and pointed out that Mr. Gardner had made false charges in numerous other cases which had been disproven. Gardner could not recall one specific case in which this had happened. Gardner never worked in California and had not worked on this case. Thus, any illicit activities engaged in by him in Arizona were totally irrelevant in this case. Gardner stated that Southern Pacific's train crews were prohibited by written rule from discussing accidents with law enforcement officers unless a claims man were present. When the rule was read it was silent concerning the presence of claims men, nor did it preclude crew members from giving basic facts concerning the accident. The most objectionable aspect of the testimony was that it was irrelevant. Engineer Murphy had given a full statement to the highway patrol going beyond the limitations prescribed by the rule.

Gardner also testified that it was company policy to have claims people present when crew members made out their 2611 (accident

report) forms, the purpose being to dissuade employees from putting down anything that was potentially damaging. Such testimony was totally irrelevant because Southern Pacific employees did complete 2611's with no claims men present.

Gardner's testimony concerning railroad sharp practices in Arizona, even if true, had no bearing whatsoever on the material issues of this case.

7. ■■■ Evidence of a subsequent accident at the crossing was admissible.

Defendants also contend that the court erred in admitting evidence of a subsequent accident at the crossing. The evidence was that in 1972 a woman was crossing the tracks at the Dowrelio crossing heading toward the parking lot when her shoe caught in a hole in the asphalt causing her to fall. The court ruled that evidence was admissible on the issue of the dangerous and defective condition of the area.

"A subsequent accident would not be relevant on the issue of *knowledge or notice* of a possibly dangerous condition at the time of the injury giving rise to the action. But a subsequent accident at the same or a similar place, under the same or similar conditions, is just as relevant as a prior accident to show that the condition was in fact *dangerous or defective*, or that the injury was *caused* by the condition. (See McCormick, p. 351; 61 Harv.L.Rev. 207, note 5; 81 A.L.R. 685.)" (Witkin, Cal. Evidence (2d ed. 1966) Circumstantial Evidence, § 353, pp. 313-314.) Defendants contend that the accidents were dissimilar because the subsequent accident occurred on the westbound main instead of the eastbound main and in the middle of the walkway rather than on the left edge.

The question of the admissibility of evidence of prior and subsequent accidents is primarily one for the trial court and is confined to its sound discretion. (*Kopfinger* v. *Grand Central Pub. Market* (1964) 60 Cal.2d 852, 860 [37 Cal.Rptr. 65, 389 P.2d 529].) It cannot be said that the court was in error in admitting the evidence of the subsequent accident as it was sufficiently similar to the accident in question.

8. ■■■ Southern Pacific's motion to take judicial notice of certain proceedings must be denied.

Southern Pacific asks this court to take judicial notice of certain judicial proceedings in the case of Torres v. National Abrasive Company, San Joaquin County Superior Court No. 103899. It contends that plaintiffs' expert witness, "Allen William Dickenson," is an imposter and that it made this discovery two or three weeks prior to preparing its opening brief on appeal, long after a new trial motion could have been made.

The contents of the judicial proceedings upon which Southern Pacific bases its allegations appear in the appendix to its opening brief. At these proceedings which occurred in chambers before The Honorable Chris Papas, an attorney disclosed that Mr. Dickenson is an imposter who by false statements concerning his background successfully deceived many California law firms who have used him as an expert witness.

Southern Pacific requests this court to take judicial notice of these proceedings pursuant to Evidence Code sections 459 and 452, subdivision (d). Southern Pacific specifically requests that this court take judicial notice of the charges made against the expert witness and of the controversy involving him and remand the matter to the superior court for a hearing on the merits of the contentions, the probable impact of the perjured testimony on the verdict and whether Southern Pacific was diligent in discovering the fraud.

A reviewing court *may* take judicial notice of any matter specified in Evidence Code section 452. (Evid. Code, § 459.) Section 452, subdivision (d), states that judicial notice may be taken of "Records of (1) any court of this state or (2) any court of record of the United States or of any state of the United States." It is noted that section 459, subdivision (d) provides in part that "if the reviewing court resorts to any source of information not received in open court or not included in the record of the action . . . the reviewing court shall afford each party reasonable opportunity to meet such information before judicial notice of the matter may be taken." However, as stated in Witkin, California Evidence (2d ed. 1966) Judicial Notice, section 190, page 172, section 459 "merely deals with the power and duty *to take judicial notice* on appeal; the effect of matters thus noticed raises problems of appellate practice outside the scope of the Evidence Code." Thus, although this court may take judicial notice of the proceedings of a court of this state, whether or not the matter is to be considered on review is a question which must be considered in light of the propriety of considering the matter on review.

This matter could have been brought before the trial court in defendants' motion for a new trial (Code Civ. Proc., § 657) but was not due to Southern Pacific's discovery of the matter at a much later time. "The claim of newly discovered evidence as a ground for new trial is uniformly looked on by the courts with distrust and disfavor because the policy of the law requires a litigant to exhaust every reasonable effort to produce at his trial all existing evidence on his behalf. [Citations.] The court is, however, authorized to permit production of newly·discovered evidence if its nature makes a different judgment probable on retrial, if there is no lack of diligence in failing to produce it at the trial, and if the evidence is not primarily cumulative. [Citations.] *But newly discovered evidence to impeach or discredit a witness, even when discovered shortly after trial and made the basis of a motion for new trial, is not sufficient to require granting of a new trial.* [Citations.]" (*Lubeck* v. *Lopes* (1967) 254 Cal.App.2d 63, 67-68 [62 Cal.Rptr. 36]; italics added; see also *Dandini* v. *Dandini* (1956) 146 Cal.App.2d 193, 197 [303 P.2d 556].)

On the other hand, "although a new trial will not ordinarily be granted on the ground of newly discovered evidence where the evidence is merely impeaching in character [citation], nevertheless there is no hard and fast rule that such evidence cannot constitute newly discovered evidence of such material character as to support an order granting a new trial." (*Charles* v. *Rice* (1959) 173 Cal.App.2d 599, 605 [343 P.2d 760].)

■ There is no authority for reversing a judgment on appeal on the ground of newly discovered evidence to impeach or discredit a witness. Where no objection to a witness' qualifications was made at trial, an objection cannot be made for the first time on appeal. (*Bundy* v. *Sierra Lumber Co.* (1906) 149 Cal. 772, 775 [87 P. 622]; *People* v. *Roberts* (1963) 213 Cal.App.2d 387, 393 [28 Cal.Rptr. 839].) ■ Indeed, Southern Pacific asks this court only to remand the matter to the trial court for a hearing; however, there does not appear to be any authority for this action nor does such extraordinary action appear to be warranted in this case. Although defendants' counsel did move to strike all of the witness' testimony on the grounds that plaintiffs' counsel had failed to reveal that Dickenson would testify at trial, defendants' counsel made no voir dire of the witness at trial. There furthermore appears to be no reason why the information concerning the witness could not have been discovered by Southern Pacific previous to the running of the time for filing motion for a new trial. Although the rule that the appellate court will not consider

points not raised below is limited to matters involving only the rights and interests of the litigant which could have been cured in the trial court, the matter now raised by Southern Pacific could have been cured in the trial court had the railroad checked into the background of the witness. Moreover, the issue which Southern Pacific raises is not a legal issue involving public interest or public policy where courts have recognized exceptions to the general rule. (See *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431]; *United California Bank* v. *Bottler* (1971) 16 Cal.App.3d 610, 616 [94 Cal.Rptr. 227].)

The court at this late date may not take judicial notice of Torres v. National Abrasive Co., *supra.*

*Plaintiff Simmons' appeal.*

9. ▇▇▇▇ The court did not err in failing to instruct that the jury could award punitive damages.

Plaintiff Simmons contends that the court was in error in refusing to permit the issue of punitive damages to go to the jury.

Civil Code section 3294 provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

The trial court stated, "I just cannot give [the alleged evidence of malice] the weight to which you think it is entitled. I do not think there is any substantial evidence on the issue of malice in this case at that crossing."

▇▇▇▇ Malice as used in Civil Code section 3294 means malice in fact, not malice in law. (*Wolfsen* v. *Hathaway* (1948) 32 Cal.2d 632, 647 [198 P.2d 1], overruled on other grounds in *Flores* v. *Arroyo* (1961) 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263].) *"There must be an intent to vex, annoy or injure. Mere . . . negligence, even gross negligence is not sufficient to justify an award of punitive damages.* [Citations.] Under general definition, malice in fact denotes ill will on the part of the defendant, or his desire to harm for the mere satisfaction of doing it. In

ultimate analysis, malice in fact is malice of evil motive. [Citation.]" (*Ebaugh* v. *Rabkin* (1972) 22 Cal.App.3d 891, 894 [99 Cal.Rptr. 706].)

Even assuming that the railroad engaged in file-stripping, evidence suppression, and wilful refusal to file accident reports, these matters occurred long after the accident and could not have had any bearing on the accident itself. *Noe* v. *Kaiser Foundation Hospitals* (1967) 248 Ore. 420 [435 P.2d 306, 27 A.L.R.3d 1268], is a decision involving a medical malpractice/battery claim arising out of an unauthorized circumcision performed on a baby. After the mistake was made hospital personnel tried to hide records and deny blame. The medical resident who performed the circumcision denied to the parents that she had taken part. The court said, "Inconsistencies, evasions and untruths made subsequent to the occasion have been considered by this court to be only evidence of an attempt to avoid responsibility for past actions rather than evidence of previous disregard for consequences. [Citation.] The subsequent statements of the resident fall into this category." (*Id.* at p. 309.)

In *O'Harra* v. *Pundt* (1957) 210 Ore. 533 [310 P.2d 1110], punitive damages were disallowed a negligent wrongdoer, who later lied to cover up his mistake, on the ground that it was the defendant's state of mind at the time of the wrongdoing that was determinative of malice. "An innocent or negligent act could not be converted into a wanton and wilful one by the fact that defendant thereafter sought by improper means to justify his mistake." (*Id.* at p. 1119.)

Southern Pacific's motion to take judicial notice of the proceedings in Torres v. National Abrasive Co. is denied. The judgment in favor of plaintiffs is reversed. Plaintiff Simmons' appeal is dismissed. Each party will bear its own costs.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied October 27, 1976, and the opinion was modified to read as printed above. The petition of the plaintiff and appellant for a hearing by the Supreme Court was denied November 24, 1976.