Filed 11/22/13  Olar v. Miller CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAWN OLAR,<br><br>　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>BOBBY RAY MILLER, JR., M.D.,<br><br>　　Defendant and Appellant. | F064025<br><br>(Super. Ct. No. S-1500-CV-268565)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Sidney P. Chapin, Judge.

Steven J. Weinberg for Plaintiff and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson, and Ian M. Ellis; LeBeau-Thelen, Dennis R. Thelen and Steven Shayer for Defendant and Appellant.

-ooOoo-

Plaintiff and appellant Dawn Olar (Olar) brought an action for medical negligence against defendant and appellant gynecologist Bobby Ray Miller, Jr., M.D. (Miller), after she developed four vesico-vaginal fistulas following an abdominal hysterectomy he performed. The case was tried to a jury, which returned a special verdict finding Miller was not negligent. The trial court granted Olar's motion for a new trial on the ground of

insufficiency of the evidence to justify the verdict, finding the weight of the evidence on the issue of the breach of the standard of care was against the verdict. Miller appealed, challenging the grant of the new trial motion, and Olar cross-appealed, challenging the sufficiency of the evidence to support the judgment.

We affirm in part and reverse in part. Because the trial court's specification of reasons for granting a new trial was untimely, we cannot affirm that order on the ground of insufficiency of the evidence. Independently reviewing the other grounds upon which the new trial motion was based, we cannot conclude the jury's verdict was either against the law or the result of an error in law. Neither can we conclude the judgment must be reversed due to insufficiency of the evidence, as Olar has not shown that, as a matter of law, she was entitled to a finding of negligence. Consequently, we must reverse the order granting a new trial and direct the trial court to reinstate the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Miller is a board certified obstetrician/gynecologist practicing full-time in Ridgecrest. On February 27, 2008, Olar consulted Miller, who she had seen two years before for severe P.M.S., for treatment of excessive vaginal bleeding. Olar, who was 46 years old, had started bleeding the week before to such an extent that she went to the emergency room; she was experiencing severe bleeding, pain and anxiety. Olar had been passing baseball-sized clots and taking pain medication. The emergency room doctor prescribed the hormone Provera and advised Olar to make an appointment with Miller. Olar had been taking the hormone for six days when she saw Miller.

Miller, who did not have an independent recollection at trial of any specific conversation with Olar that day, took Olar's history, which included having "severe P.M.S. with associated anxiety." Olar was passing a lot of clots, taking hormones and wanted better treatment. When Miller meets with a patient who has irregular bleeding but objects to being on hormones, he tries to give them enough information to make a decision in a reasonable manner; he did not treat Olar any differently. He tells patients it

2.

may take a long time to see if hormone therapy will work, and they may have to be on hormones until menopause. Miller told Olar there were birth control pills she could take were she not a smoker, but since she smoked and was over 35 years old, the "classical drug" available to her was Provera. Miller discussed different treatments with Olar, but he knew she wanted a hysterectomy. He advised Olar to try a dilation and curettage (D & C) to see if that would stop the bleeding. Olar agreed to the procedure. Olar was anxious about having the procedure, so Miller prescribed lorazepam to ease her anxiety.

Miller performed a D & C, which was considered a treatment option, on Olar on March 3, 2008. In a history and physical Miller dictated as part of Olar's admission process, he noted Olar declined hormonal therapy at that time. According to Miller's custom and practice, before dictating the note he would have had a conversation with Olar about her decision to decline hormonal therapy. The procedure was followed by "expectant management," by which Olar would be observed over time without further treatment to see whether the bleeding would resolve. Miller saw Olar for a follow-up on March 18, 2008. At that time, she was doing fine and was not bleeding. Miller advised Olar to return in three months.

When Olar next saw Miller on June 5, 2008, her bleeding had returned. The two began talking about "definitive treatment[,]" meaning a hysterectomy. Olar previously had "a scare with a pre cervical cancer"; she had abnormal pap smear results, including a class-five finding, which is a "pre cancer." Olar reminded Miller of this and told him she "wanted everything out," including her cervix. Miller, who initially had considered doing a hysterectomy that would leave her cervix in for pelvic support, agreed to remove it.

Miller discussed endometrial ablation with Olar before the hysterectomy, but he did not believe she was a candidate because her uterus was too large. He admitted at trial that a doctor in Lancaster had equipment that could perform an ablation on a patient with her sized uterus, but he did not refer Olar there because she did not seem interested in

3.

pursuing options that would not definitively fix her problem. He would have referred Olar had she wanted and insisted on an ablation, but she was set on a hysterectomy. He did not discuss with Olar the use of a Murena I.U.D. to control irregular bleeding because it was not F.D.A. approved for such use.

In his notes of the June 5 consultation, Miller wrote that Olar desired "definitive TX," meaning she wanted the "ultimate treatment," namely a hysterectomy, which would end her irregular bleeding. While Miller offered Olar hormonal therapy, she did not want it; according to Miller, she understood that progesterone causes weight gain. After the D & C, Olar made clear to Miller she was not interested in any form of treatment other than a hysterectomy. In his experience as a practicing gynecologist, sometimes women will immediately ask for a hysterectomy. In this case, the decision "evolved."[1]

Miller performed the hysterectomy on July 14, 2008. He wrote in his operative note that there were no complications. Although Miller did not have an independent recollection of the surgery, he did recall it "went without a hitch"; he encountered no difficulties and it was a routine procedure. Olar had about "600 ML.'s" of blood loss because her uterus was large, but the blood loss did not cause any problem for Miller that he could not handle. The blood loss was within the range of normal blood loss of an uncomplicated abdominal hysterectomy and did not obstruct his operative field. The pathology report revealed the uterus was three times its normal size and had a fibroid in

---

[1] In contrast to Miller's testimony, Olar testified that at the February 27, 2008 appointment, Miller told her she had three options – hormone therapy, which probably would not work, would cause her to gain 25 to 30 pounds, and she would have to take for the rest of her life; a D & C which might work; and a hysterectomy. She decided not to take the hormones because she did not want to gain weight. When she saw Miller in June 2008 after her bleeding returned, she said Miller gave her the options of hormone therapy or hysterectomy. Olar claimed she would have chosen hormone therapy over the hysterectomy and D. & C. if Miller had suggested it. Olar also claimed Miller never talked to her about an endometrial ablation and that his recommended treatment was a hysterectomy. She claimed Miller pushed or pressured her into having the hysterectomy.

it. According to Miller, due to the size of the uterus, hormone therapy would not have helped Olar.

It took awhile for Olar's abdominal incision to fully heal. She came to Miller's office numerous times to have the incision cleaned and secondarily closed. On September 8, 2008, Olar complained to Miller of urinary leakage. Follow-up care revealed air in her bladder, which is indicative of "communication" between the bladder and the pelvis or vagina. Miller referred Olar to a urologist, Eugene Rajaratnam, M.D., who performed surgery on Olar on October 2, 2008. The surgery revealed four punctate lesions or holes, which were fistulas, all clustered together. Dr. Rajaratnam repaired the fistulas by cutting the four out, thereby creating one fistula, and then closing the holes in the bladder and vagina.

Toward the end of October, Olar began leaking urine again. A cystoscopy performed in early November revealed a fistula; the prior repair did not heal and had opened. Failure of a fistula repair is a potential risk or complication of that procedure. Miller referred Olar to a uro-gynecologist. Olar eventually transferred her care from that physician to uro-gynecologist Cynthia Hall, M.D. In March 2009, Hall operated on Olar and repaired the fistula. Hall saw Olar post-operatively through April 2009. The operation was successful and Olar made a full recovery.

*Trial*

Olar filed this lawsuit against Miller alleging a single cause of action for medical negligence. At the jury trial, Miller, Olar, and Olar's husband all testified. Expert testimony was also received. Olar presented the testimony of obstetrician and gynecologist Charles Dubin, M.D. Dubin opined it was below the standard of care for a doctor to perform an unnecessary elective hysterectomy to treat anovulatory bleeding and for Miller to perform the hysterectomy on Olar. According to Dubin, Olar's hysterectomy was unnecessary because her bleeding could have been controlled by the use of progestins, including Provera. If progestins failed, other therapies could have been

5.

tried, such as a Murena I.U.D. that delivers progestin, or an endometrial ablation, a procedure used to destroy the uterine lining. Dubin believed Olar was a candidate for endometrial ablation and estimated the success rate at 50 percent or greater. While a hysterectomy would be indicated if a patient had a life threatening condition, Olar did not have any such condition and her blood counts were normal.

Dubin testified it is below the standard of care to (1) fail to discuss with a patient alternatives to hysterectomy, (2) give a patient incorrect information, such as telling a patient like Olar that Provera probably would not work or that she was not a candidate for ablation, and (3) perform a hysterectomy on a patient with anovulatory bleeding merely because she demanded one. In Dubin's opinion, the only indication for hysterectomy in patients with anovulatory bleeding is if they truly fail adequate trials of medical therapy. Dubin did not believe a physician should perform a hysterectomy just because a patient who did not want to try alternative therapies demanded one.

Dubin confirmed that after the hysterectomy Olar developed four vesico-vaginal fistulas, which he explained is an abnormal communication between the bladder, or vesica, and the vagina. The fistulas were small, each about the size of a pin-hole. In Dubin's opinion, to a reasonable degree of medical probability, the fistulas were caused by sutures being placed in the bladder when the vaginal cuff was sewn. Dubin explained that after removing the uterus, the surgeon sutures the vaginal cuff closed and, in doing so, must ensure the bladder is separated from the vagina by at least two or three centimeters; otherwise, a suture could catch the bladder's edge, thereby creating tension on the bladder tissues that can lead to a breakdown or fistula. Dubin stated it is below the standard of care to inadequately separate the bladder from the area of the vaginal cuff and put sutures in the bladder, and Olar's surgery was below that standard. Dubin testified there are four mechanisms by which a fistula can develop: infection, cauterization, thinning of the bladder, and sutures. He concluded suturing was the only way one could possibly get four fistulas, and testified this conclusion was supported by Rajaratnam's

6.

operative report, in which he described the fistulas' location as being on the bladder's posterior wall, and a picture he drew showed the fistulas at the apex of the vaginal cuff where sutures would be placed.

While Dubin recognized it is possible to get one fistula in a properly performed surgery, such as where there is imperfect tissue that thins out, to get four would require a totally different mechanism of injury. In this case, he believed that mechanism had to be sutures and pinching the edge of the bladder. According to Dubin, a surgeon should never suture something he or she cannot see or has not conclusively identified. Dubin acknowledged it can be difficult to separate the bladder from the vagina when the patient has a preexisting problem, such as previous radiation therapy, infection or surgery, but Olar had none of these problems. Dubin did not think there was any reason Olar's bladder could not have been separated and properly operated on. In Dubin's opinion, to a reasonable degree of medical probability, four vesico-vaginal fistulas should not happen unless Miller was negligent and the most likely negligence was failure to provide adequate separation between the bladder and vagina.

Dubin acknowledged that any patient who undergoes an abdominal hysterectomy is at risk for complications, including fistula formation, and a fistula can occur in the absence of negligence. A well-trained gynecologic surgeon could do everything he or she had been trained to do in a conscientious fashion within the standard of care and nevertheless have a patient develop a single fistula; if only one fistula developed, the standard of care would be met unless the operative report showed faulty technique. Had Olar developed only one fistula, Dubin would not have any standard of care criticism of Miller's surgical technique.

During a normal hysterectomy, a tissue breakdown can occur when the bladder thins as it is being dissected off the vagina; Dubin agreed the bladder could thin even if the surgeon did everything correctly, but he believed that would lead to only one fistula. In Dubin's opinion, the bladder wall should not thin in a normal, uncomplicated

hysterectomy, and here Miller did not identify any complications that occurred during the surgery. Dubin agreed that if a sufficient surface area of the bladder wall were thinned, more than one fistula could develop, but "that would be so, so rare." While Rajaratnam documented in his operative report that the bladder's posterior wall was thinned and the fistulas were on the posterior wall, Dubin explained the fistulas were higher than the thinned area.

Dubin agreed some errors or mistakes are acceptable within the standard of care and do not mean the doctor has done anything wrong, such as where a surgeon does all he or she is trained to do yet the patient develops a single fistula. Dubin did not agree that a careful surgeon could catch part of the bladder wall with a suture and be within the standard of care, since the surgeon had to clear the area enough to identify what was being sutured. Dubin explained that Olar was an uncompromised patient, so there was no reason why Olar's bladder could not be dissected enough to clearly identify the structures visually and place the sutures safely away from the bladder. Dubin did agree that, as a generic proposition, a surgeon could reasonably believe he or she is in the correct surgical tissue plane yet be in a different place, or reasonably identify something that turns out to be an incorrect identification, and still be within the standard of care.

Dubin had performed somewhere between 500 and 1,000 hysterectomies, and assisted in another 500 to 1,000 of them. None of Dubin's patients had ever developed a vesico-vaginal, or any other type, fistula. In healthier patients, the rate of developing a fistula is low, about one in 500 to 1,000. Dubin had never heard of a patient developing four vesico-vaginal fistulas after an abdominal hysterectomy until this case.

Called by the defense, Cynthia D. Hall, M.D., the uro-gynecologist who repaired Olar's fistula, gave expert opinion concerning the cause of Olar's fistulas. Hall testified that hysterectomy is the most common surgery that causes vesico-vaginal fistulas; a fistula is an inherent risk of a hysterectomy because the vagina and bladder are densely adherent, with only a couple layers of tissue between them. While the risk increases the

8.

more difficult the hysterectomy is, there is always a risk no matter what kind of hysterectomy is being performed, i.e. whether the hysterectomy is abdominal or vaginal, complicated or uncomplicated. A single fistula following an uncomplicated hysterectomy can occur either in the absence of negligence or as a result of negligence. In treating Olar, Hall did not form an opinion that a substandard surgery caused Olar's fistulas, since a fistula can develop with any hysterectomy. According to Hall, a surgeon can damage the bladder while trying to peel it apart from the vagina and can easily get into the bladder if "you are not exactly in the right plane." It can appear to a careful, skilled surgeon that he or she is in the right plane when it is determined later that the surgeon must not have been.

Hall further explained that placing a suture into the bladder wall is an inherent risk of hysterectomy surgery. This is because the two structures are so densely adherent and the more aggressive you get with dissecting the bladder from the vagina so the uterus can be removed, the more likely one is to actually cut the bladder. Hall said there is a "fuzzy area there, what is enough and what is too much," and agreed it was a matter of surgical judgment. Hall did not think it was sensible to conclude a surgeon must have been negligent if a patient developed four fistulas after an abdominal hysterectomy. She might conclude negligence was involved if the fistulas were all over the place, but if they were in a line, the surgeon could easily have caught the bladder in a few places while stitching the top of the vagina closed. In Hall's experience and training, this is considered an inherent risk of a hysterectomy. Hall's "best guess" is that the four fistulas Olar developed resulted from sutures being placed in the bladder while closing the vaginal cuff.

Hall agreed surgeons try to carefully and completely move the bladder off the vaginal cuff when performing a hysterectomy to prevent putting sutures in the bladder when sewing the vaginal cuff. She also agreed that a board certified "ob-gyn" is trained to do his or her best to identify or differentiate between the vaginal cuff and bladder.

When asked by Olar's counsel if, in the absence of a difficult surgery, cancer or excessive bleeding causing complications, a doctor exercising reasonable care should not put sutures in the bladder when sewing the vaginal cuff, Hall answered, "No. Complications occur in surgery. If you are a surgeon, you can have complications." Hall further explained that "you do your best to avoid it[,]" "[y]ou try to get into that plane[,]" you try not to injure the bladder in any way, and try to get your stitches away from the bladder, "[b]ut, no, it's a known complication, zero, .5 percent of simple hysterectomies are going to result in fistula. It may not sound like a lot, but that's still one in 500." Hall did not know how many of that percentage resulted from sutures in the bladder and presumed that figure was from all causes.

Hall had performed between 80 to 100 abdominal hysterectomies unrelated to uro-gynecology; to her knowledge, none of those patients developed vesico-vaginal fistulas. As a uro-gynecologist, she had repaired vesico-vaginal fistulas in about 10 patients; none of these involved four fistulas. Hall had not read a case report of a patient developing four vesico-vaginal fistulas as a result of an elective, uncomplicated hysterectomy, seen that presented at a seminar, or read it in the literature, as "[i]t's not publishable." Hall explained it did not matter whether there was one or more fistulas in terms of how it was reported in "the literature," "because it's not interesting enough." Hall agreed that she would not be surprised if "the literature" did not talk about patients in terms of the number of fistulas and instead talked about the concept of the complication occurring.

Miller's retained expert, retired obstetrician and gynecologist Martin Feldman, M.D., opined that giving Olar the option of having a hysterectomy after her bleeding returned in June 2008 was within the standard of care since she had declined hormonal therapy. Feldman explained that a patient must be offered alternatives; if they decline those alternatives and there is an indication for the procedure, as there was here, then a doctor must respect the patient's right to make that choice, as long as the patient has given informed consent. Feldman also explained that hormone therapy and D & C do not

10.

always work for all patients; the only thing that will definitively stop uterine bleeding is to remove the uterus.

In Feldman's opinion, Olar's irregular bleeding meant she was a reasonable candidate for a hysterectomy, especially since she declined any other management, specifically hormonal therapy. Feldman did not agree that Miller acted below the standard of care by performing an abdominal hysterectomy because Olar had not failed a trial of medical management or had an endometrial ablation. Feldman thought it was Olar's right, once she was informed of the options, to choose; Feldman said this was well-established and supported by the American College of Obstetrics and Gynecology. Feldman agreed it was more likely than not that Olar's anovulatory bleeding would have resolved with an oral progestin or endometrial ablation. He also agreed it was below the standard of care for an "ob-gyn" to perform an unnecessary or elective hysterectomy that was not indicated.

Feldman testified the inherent risks of both abdominal and vaginal hysterectomies include infection, bleeding and injury to adjacent structures, such as the bladder, bowel and ureters. These risks are inherent because the surgeon is working very close to those structures and, even in the best of hands and despite all efforts, the structures can be injured during the procedure. These risks can occur in the absence of the surgeon's negligence. Feldman agreed that hypothetically it is statistically predictable that if you perform 1,000 hysterectomies, a certain number of patients will experience one or more of these complications. According to Feldman, the incidence of vesico-vaginal fistulas is "commonly quoted at one percent."

Feldman identified four causes of vesico-vaginal fistulas: (1) an inadvertent cystotome, or hole in the bladder, that is not recognized or repaired at the time of surgery, which can be caused by an instrument or a tear; (2) one or more sutures placed in the bladder; (3) the bladder wall thinning out while being taken down off the cervix, which can lead to devascularization of the area; and (4) a thermal injury caused by heat from a

11.

cautery used to coagulate bleeding vessels. While Feldman thought to a reasonable degree of medical probability one of these four caused Olar's fistulas, he could not say to a reasonable degree of medical probability which one.

According to Feldman, placement of sutures in the bladder wall is a recognized risk of an abdominal hysterectomy. When asked how this could occur in an uncomplicated hysterectomy without negligence, Feldman answered, "Because we all try to be very careful in what we do and identify what we're sewing, and we can believe at the time that the bladder is completely clear of where we're placing sutures, and for one reason or another, that's not correct, whether the tissue field is somewhat obscured with blood, or whatever, that would be my answer to that question." By "tissue field," Feldman meant "the operative field, tissue plane."

It did not make any real difference to Feldman if there was one fistula or four because "the mechanism is the same, whether it's a suture, whether it's thinning of the bladder taking it down, those things can result in one or more fistulas. And the notion that a single fistula is okay and multiple fistulas are not is not correct." As an example, Feldman explained that if the cause were a thinning of the bladder while taking it down and it is "okay" if one fistula developed, then "it would be okay if two or three or four of these resulted, these pin-point openings occurred[,]" because the mechanism is still the same. Feldman did not see how one could be okay but not four. He agreed with Dubin that a fistula is an inherent risk of the surgery that can occur in the absence of negligence, but "[w]hy we depart is that he feels that one is okay, but two or more is not, and that doesn't make any sense to me."

He believed Miller met the standard of care in terms of Olar's care and treatment because: when Olar presented in his office with bleeding at the end of February 2008, he performed a D & C to determine the cause of the bleeding and rule out a malignancy; Miller asked Olar to come back for follow-up, which she did three weeks later, and the bleeding had stopped; it was apparent from the reports she had declined hormonal

therapy, which was discussed with her; and when she subsequently returned to his office in June, the options were discussed, she declined hormonal therapy and desired "definitive therapy," i.e. a hysterectomy, which was her right. It appeared from his review of the records in the case that, before the hysterectomy was carried out, Olar was informed about other options, such as medical management or lesser invasive surgical procedures, which satisfied the standard of care. Feldman opined the surgery also met the standard of care as everything Miller described in his operative report was appropriate, as was his post-operative management and care.

Feldman had performed between 500 and 1,000 hysterectomies in his career; he was not aware of any patient who developed a vesico-vaginal fistula. He had never personally seen a patient who had four vesico-vaginal fistulas following a hysterectomy, heard about such a patient at a seminar, or read about it in medical literature or a textbook. Feldman agreed the standard of care requires a doctor performing an abdominal hysterectomy to completely and carefully remove the bladder from the vaginal cuff. When asked whether the failure to adequately and completely remove the bladder off the vaginal cuff was below the standard of care, Feldman responded, "Well, you have to do that. So, yes – I mean, the standard, in order to do the surgery, you have to get the bladder off onto the vagina." Feldman agreed failure to separate the bladder from the vaginal cuff risks the placement of sutures in the bladder while sewing the vaginal cuff, which in turn may cause a fistula, and inadequate mobilization of the bladder away from the upper vagina, or inadequate exposure and retraction, can lead to placement of sutures in the bladder. Feldman agreed it was a basic surgical principle that a doctor should not suture or cut a structure unless he believes he has conclusively identified it; board certified doctors "are trained to believe they can determine the difference" between the vagina and bladder.

Miller also testified he met the standard of care in Olar's care and treatment. He learned through his training and experience that there are risks associated with a

13.

hysterectomy, including infection, medical conditions that cause poor healing, excessive bleeding that requires a transfusion, and fistula formation. Patients undergoing a hysterectomy are counseled that there is a risk of damage to adjacent organs, as well as the organ being operated on, which can take multiple forms, such as puncturing a bowel with a scalpel. In Miller's training and experience, these risks can occur even when a surgeon is doing his or her level best, and is being conscientious and skillful in conducting the surgery. Miller agreed it was important to dissect the bladder completely off the vaginal cuff so that sutures do not get into the bladder when the vaginal cuff is sewn. Before Olar's hysterectomy, none of Miller's approximately 400 hysterectomy patients had developed a vesico-vaginal fistula. Miller agreed that vesico-vaginal fistulas are very rare when gynecologic surgery is done properly. The risks of developing a complication were low, but for a high-volume doctor who does 400 cases, one percent equals four people who will suffer a known complication.

*Argument and Jury Instructions*

In closing argument, Olar's counsel explained to the jury that Olar was suing Miller for two separate, distinct reasons: (1) performing an unnecessary, elective hysterectomy and (2) negligently performing the surgery by putting sutures in the bladder while sewing up the vaginal cuff, resulting in four vesico-vaginal fistulas. Olar's counsel argued both res ipsa loquitur and general negligence with respect to the performance of the surgery and general negligence with respect to the unnecessary hysterectomy.

The jury was given instructions on both general negligence and res ipsa loquitur. The jury was instructed: "Dawn Olar, plaintiff, claims that she was harmed by defendant Dr. Miller's medical/professional negligence. To establish this claim, plaintiff must prove all of the following: [¶] 1. That defendant was professionally negligent; [¶] 2. That plaintiff was harmed; and [¶] 3. That defendant's professional negligence was a substantial factor in causing plaintiff's harm." The jury was further instructed: "An obstetrician/gynecologist is negligent if he fails to use the level of skill, knowledge, and

14.

care in diagnosis and treatment that other reasonably careful obstetrician/gynecologists would use in similar circumstances.  This level of skill, knowledge, and care is sometimes referred to as 'the standard of care.'  [¶]  You must determine the level of skill, knowledge, and care that other reasonably careful obstetrician/gynecologists would use in similar circumstances based only on the testimony of the expert witnesses, including Dr. Miller, who have testified in this case."

The jury was also instructed:  "An obstetrician/gynecologist is not necessarily negligent just because his efforts are unsuccessful or he makes an error that was reasonable under the circumstances.  Such a type of medical practitioner is negligent only if he was not as skillful, knowledgeable, or careful as other reasonable obstetricians/gynecologists would have been in similar circumstances." ; and "An obstetrician/gynecologist is not necessarily negligent just because he chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice."

Finally, the jury was instructed on res ipsa loquitur:  "In this case, plaintiff may prove that defendant's negligence caused her harm if she proves all of the following:  [¶] 1. That plaintiff's harm ordinarily would not have occurred unless someone was negligent.  In deciding this issue, you must consider only the testimony of the expert witnesses; [¶]  2. That the harm occurred while plaintiff was under the care and control of defendant; and [¶] 3. That plaintiff's voluntary actions did not cause or contribute to the events that harmed her. [¶] If you decide that plaintiff did not prove one or more of these three things, then you must decide whether defendant was negligent in light of the other instructions I have read. [¶] If you decide that plaintiff proved all of these three things, you may, but are not required to, find that defendant was negligent or that defendant's negligence was a substantial factor in causing plaintiff's harm, or both. [¶]  You must carefully consider the evidence presented by both plaintiff and defendant before you make your decision.  You should not decide in favor of plaintiff unless you believe, after

15.

weighing all of the evidence, that it is more likely than not that defendant was negligent and that his negligence was a substantial factor in causing plaintiff's harm."

At the conclusion of the jury trial, the jury returned a special verdict in which it answered a single question: "Was Bobby Ray Miller, M.D. negligent in the diagnosis and treatment of Dawn Olar?" The jury answered no. The trial court entered judgment on the jury's verdict in favor of Miller on September 8, 2011.[2] The clerk mailed a notice of entry of judgment to the parties that same day.

*Motion for a New Trial*

Olar filed a notice of intention to move for new trial on September 21, which listed 11 separate grounds for the motion that encompassed six of the seven statutory grounds for a new trial: (1) irregularity in the proceedings of the court, jury, defendant, any order of the court, and abuse of the court's discretion (Code of Civ. Proc.,[3] § 657, subd. (1)); (2) jury misconduct (§ 657, subd. (2)); (3) accident or surprise (§ 657, subd. (3)); (4) newly discovered evidence (§ 657, subd. (4)); (5) insufficiency of the evidence and the verdict is against the law (§ 657, subd. (6)); and (6) error in law (§ 657, subd. (7)).

Olar filed a memorandum of points and authorities on September 28, in which she argued she was entitled to a new trial on the following grounds: (1) irregularities in the proceedings relating to testimony and arguments offered by Miller's trial counsel in violation of Motion in Limine No. 4; (2) insufficiency of the evidence to justify the verdict, as the evidence established Miller was negligent both in performing an unnecessary hysterectomy and in performing the hysterectomy; and (3) the verdict was against the law insofar as Miller failed to provide information on alternative treatments.

At the November 4 hearing on the new trial motion, the trial court granted the motion solely on the basis of insufficiency of the evidence to justify the verdict under

---

[2] Subsequent references to dates are to dates in 2011 unless otherwise noted.

[3] Undesignated statutory references are to the Code of Civil Procedure.

16.

section 657, subdivision (6). The court explained it granted the motion because the "weight of the evidence with regard to the breach of the standard of care in the performance of the hysterectomy, specifically, in failing to complete a careful removal of the bladder off of the vaginal cuff resulting in four sutures being placed in the bladder closing the vaginal cuff causes four vesico-vaginal fistulas is against the verdict." The court stated the motion was "otherwise denied[,]" and asked Olar's counsel to "submit a formal order." The minute order of the hearing states the ground for granting the new trial, namely insufficiency of the evidence to justify the verdict, and that Olar's counsel is to prepare and submit a formal order, but does not include the court's explanation.

On November 9, Olar's counsel circulated a proposed statement of reasons, to which Miller objected. In a letter from Miller's counsel to the court filed on November 14, Miller's counsel explained he had objected to the proposed statement of reasons and attached a copy of his letter to Olar's counsel. On November 29, Miller filed a notice of appeal from the November 4 order granting the new trial. On December 1, Olar's counsel filed a letter with the trial court requesting it not sign the proposed statement of reasons "in light of the requirements of C.C.P. § 657 and the cases interpreting it."

At a case management conference held on December 2, the trial court explained: (1) Olar's counsel's proposed order was stamped into the court's mail processes on November 21, and routed to it on November 30; (2) the November 14 letter from Miller's counsel was routed to it on December 1; and (3) it received Olar's counsel's December 1 letter. The court further explained that when it received the proposed order on November 30, it recognized both that the court was required to prepare the order and there was an issue with respect to the order's timeliness. The court noted the hearing on the new trial motion had been continued from November 1 to November 4 based on the parties' stipulation, and it was required to rule on the motion by November 7. The court stated that, while it announced its ruling and the basis therefore at the November 4 hearing, it erroneously directed Olar's counsel to prepare the formal order. The court acknowledged

17.

that while the November 4 minute order described the ruling granting the motion on the basis of section 657, subdivision (6), it did not recite all of the court's statements concerning the basis for the ruling. The court recognized the 10-day time limit to file the statement of reasons would have run on November 14, and stated that "based on the judicial error," and without the fault of Olar's counsel, "the matter, essentially, got out of sight, out of mind" until November 30, when the court was reviewing for the case management conference.

The trial court stated its intent to issue "an order directing I signed the formal order prepared by the court on November 30[,]" and to further order it be entered nunc pro tunc to November 14. The court stated it did not solicit a stipulation to an entry nunc pro tunc given the various issues surrounding the 10-day limit that Miller's counsel may want to address on appeal, and had not entered the November 30 order yet because it wanted to discuss the order with counsel at the December 2 conference. The court further explained that the order, which the court prepared, would reflect the date on which it was signed. The court believed it was within its inherent power to order the nunc pro tunc entry, and again asserted it was due to judicial error.

In a written order filed and signed on December 2, the trial court explained: it issued the order on the motion for new trial as of November 30; the delay was not the litigants' fault, instead "[t]he Court, through inadvertence, failed to have in mind the requirement for entry of the order" as set forth in section 657; on November 4, it had stated the specific grounds and bases for granting the motion on the record in the presence of counsel; the minute order reports the motion was granted on grounds of insufficiency of the evidence to justify the verdict pursuant to section 657, subdivision (6); the court mistakenly ordered counsel to prepare the formal order; the court prepared its written order "issued" November 30; and the motion was determined on November 4, within 60 days of the notice of entry of judgment on the jury verdict. The court therefore

18.

ordered that the order granting the motion for new trial, dated November 30, be entered effective November 14.

A written order granting a new trial, signed by the court on November 30 but file stamped with the date of November 14, states that Olar's motion for a new trial is granted, the verdict and judgment are set aside and vacated, and a new trial ordered on all issues. The order further states: "The Court's reasons for granting this New Trial Motion on grounds of insufficiency of the evidence to justify the verdict pursuant to C.C.P. § 657(6) as stated on the record are as follows: The weight of the evidence with regard to a breach of the standard of care in the performance of the hysterectomy, specifically in failing to complete a careful removal of the bladder off o[f] the vaginal cuff, resulting in four (4) sutures being placed in the bladder when closing the vaginal cuff, causing four (4) vesicovaginal fistulas, is against the verdict."

On December 12, Olar filed a cross-appeal from the September 8 judgment after jury trial. On February 2, 2012, Miller filed a notice of appeal from the December 2 order.

## DISCUSSION

I. The Motion for New Trial

In his appeal, Miller contends the order granting a new trial must be reversed because it did not comply with section 657, thereby rendering it defective, and there is no other valid basis for granting a new trial. We agree.

We first set forth the applicable legal principles regarding a motion for new trial. "The authority of a trial court in this state to grant a new trial is established and circumscribed by statute." (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633 (*Oakland Raiders*).) The governing statute, section 657, identifies seven grounds for a new trial, including: "Irregularity in the proceedings"; "Insufficiency of the evidence to justify the verdict . . . or the verdict . . . is against law"; and "Error in law." (§ 657, subds. (1), (6) & (7).)

19.

A party seeking to move for a new trial must file and serve a notice of intention to move for a new trial "designating the grounds upon which the motion will be made. . . ." (§ 659.) This notice is "deemed to be a motion for a new trial on all the grounds stated in the notice." (*Ibid.*) In general, "the motion for new trial can only be granted on a ground specified in the notice of intention to move for a new trial." (*Wagner v. Singleton* (1982) 133 Cal.App.3d 69, 72 (*Wagner*).)

Section 660 sets forth the timeframe by which the trial court must rule on the new trial motion. This section provides, in relevant part: ". . . the power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court . . . If such motion is not determined within said period of 60 days . . . the effect shall be a denial of the motion without further order of the court. A motion for a new trial is not determined within the meaning of this section until an order ruling on the motion (1) is entered in the permanent minutes of the court or (2) is signed by the judge and filed with the clerk. The entry of a new trial order in the permanent minutes of the court shall constitute a determination of the motion even though such minute order as entered expressly directs that a written order be prepared, signed and filed. The minute entry shall in all cases show the date on which the order actually is entered in the permanent minutes, but failure to comply with this direction shall not impair the validity or effectiveness of the order." (§ 660, par. 3.)

An order granting a new trial motion must state not only the ground upon which the motion is granted but must also specify the reasons for granting the motion on that ground. (*Oakland Raiders, supra,* 41 Cal.4th at p. 633.) In relevant part, section 657 provides: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated. [¶] ... [¶] The order passing upon and determining the motion must be made and entered as provided in Section 660 and if the motion is granted must state the ground or grounds relied upon by the court, and may

20.

contain the specification of reasons.  If an order granting such motion does not contain such specification of reasons, the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk."

The terms "grounds" and "reasons" have different meanings.  (*Oakland Raiders, supra,* 41 Cal.4th at p. 634; *Mercer v. Perez* (1968) 68 Cal.2d 104, 112 (*Mercer*).)  "The word 'ground' refers to any of the seven grounds listed in section 657," and "[a] statement of grounds that reasonably approximates the statutory language is sufficient." (*Oakland Raiders, supra,* at p. 634.)  In contrast, a statement of reasons "should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely on inference or speculation."  (*Ibid.*; see also *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 137 [specification of reasons adequate where it enabled the parties "to discuss intelligently the question whether there was any substantial evidence to support the judge's reasons"].)

"California courts have consistently required strict compliance with section 657." (*Oakland Raiders, supra,* 41 Cal.4th at p. 634.)  The statutory requirement in section 657 "that the statement of reasons be filed no later than 10 days after the order granting a new trial is jurisdictional, and a statement of reasons filed more than 10 days after the order is ineffective."  (*Oakland Raiders, supra,* 41 Cal.4th at p. 634; accord, *La Manna v. Stewart* (1975) 13 Cal.3d 413, 418 (*La Manna*); *Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862, 867–868 (*Hand Electronics*).)  "Substantial compliance with the statute is not sufficient."  (*Oakland Raiders, supra,* at p. 634; see *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 566 (*Fergus*) [specification of reasons filed 15 days after minute order granting a motion for new trial deemed a nullity because it was filed more than 10 days after entry of the new trial order]; *Swanson v. Western Greyhound Lines, Inc.* (1969) 268 Cal.App.2d 758, 760 [because trial court's jurisdiction to specify reasons expired 10 days after entry of a minute order granting a new trial, specification of reasons filed 14 days later was ineffective]; *La Manna*, *supra*, 13 Cal.3d

at pp. 419-423 [oral statement of reasons set down in reporter's transcript does not comply with statute].)

Here, while the trial court's grant of the motion for new trial was timely, as it granted the motion within 60 days of the clerk's service of the judgment as reflected in the November 4 minute order, there is no question the trial court filed its specification of reasons beyond the 10-day period. The trial court did not order the filing of the specification of reasons, which it signed on November 30, until December 2, which is more than 10 days after November 4. Pointing to the trial court's docket in this case, which lists the written order granting the new trial and specification of reasons as having been entered on November 14, Olar asserts the order and statement were in fact entered that day. This assertion, however, is belied by the record, which shows the trial court signed the order and specification of reasons on November 30 and did not authorize the filing until December 2, when it ordered the filing nunc pro tunc to November 14. The trial court itself acknowledged it was acting outside the statutory time limit in issuing the specification of reasons and tried to rectify the problem by entering it nunc pro tunc.

Olar contends the trial court had the authority to do so because it was correcting a clerical error. Generally, a court has the inherent power to correct clerical errors in the court's records to make them reflect the true facts. (See *In re Candelario* (1970) 3 Cal.3d 702, 705.) But clerical error must be distinguished from judicial error, and any attempt to revise deliberately exercised judicial discretion in the guise of correcting clerical error is not permitted. (*Ibid.*) The record here does not permit a finding that the order signed November 30 was an attempt by the trial court to correct clerical error. Rather, as the trial court admitted, it was attempting to correct its own error in failing to comply with the requirements of section 657.

The trial court had no authority to issue the specification of reasons it signed on November 30 because its jurisdiction to do so had expired pursuant to sections 657 and 660. As our Supreme Court has held, "'the prescribed 10-day period is a statute of

22.

limitations on the authority of the court to act, and that after the expiration of the period the court has no power to add a specification of reasons by a *nunc pro tunc* order or otherwise.'" (*La Manna*, *supra*, 13 Cal.3d at p. 418; see also *Siegal v. Superior Court of Los Angeles County* (1968) 68 Cal.2d 97, 101-102 [since the time limits of section 660 are mandatory and jurisdictional, and an order made after the 60-day period is in excess of the court's jurisdiction and void, the trial court may not grant relief by means of a nunc pro tunc order]; *Fergus, supra,* 150 Cal.App.4th at pp. 563, 565–566 [nunc pro tunc order granting new trial not allowed to frustrate the time limits of section 657]; *Sanchez–Corea v. Bank of America* (1985) 38 Cal.3d 892, 903 (*Sanchez-Corea*).)

The trial court's attempt to file a specification of reasons after expiration of the 10-day period allowed by section 660 was ineffective and an act in excess of jurisdiction which could not be cured by means of a nunc pro tunc order.  Having concluded the order was defective, we turn to the question of appellate review.

"The failure to supply an adequate specification of reasons renders the new trial order defective, but not void." (*Thompson v. Friendly Hills Regional Medical Center* (1999) 71 Cal.App.4th 544, 550.)  Where the defective order results from the failure to timely supply a specification of reasons for a new trial granted on the grounds of insufficiency of evidence or excessive damages, the order may not be affirmed on those grounds.  (§ 657; *Fergus, supra,* 150 Cal.App.4th at p. 563 [an appellate court cannot affirm a new trial order on grounds of excessive damages when that ground is not stated in the order or when "the trial court has failed to file its specification of reasons within 10 days after the entry of the new trial order in the permanent minutes"].)  As explained in *Sanchez–Corea, supra*, 38 Cal.3d at p. 905:  "If an order granting a new trial does not effectively state the ground or the reasons, the order has been reversed on appeal where there are no grounds stated in the motion other than insufficient evidence or excessive or inadequate damages.  [Citations.]  If, however, the motion states any *other* ground for a new trial, an order granting the motion will be affirmed if any such other ground legally

23.

requires a new trial." (Accord, *Oakland Raiders, supra,* 41 Cal.4th at p. 638; *Mercer, supra,* 68 Cal.2d at p. 119; *Fergus, supra,* 150 Cal.App.4th at p. 563.)

Here, Olar's notice of intent to move for new trial listed five of the seven grounds specified in section 657. In her points and authorities below, she expressly confined her request for a new trial to the grounds of insufficiency of the evidence, irregularity in the proceedings, and the verdict being against the law. The trial court granted the motion only on the ground of insufficiency of the evidence. As stated above, in such a situation we generally would be required to review the other grounds for the new trial motion stated in the notice of intent. (*Hand Electronics, supra,* 21 Cal.App.4th at pp. 870-871 [listing statutory ground for error in notice of intention to move for new trial is sufficient to place issue before the trial court; error need not be discussed in the memorandum of points and authorities].)

When an order granting a new trial is defective, such as the absence of a specification of reasons, we independently review the order granting a motion for new trial. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 640.) In doing so, we do not defer to the trial court's resolution of conflicts in the evidence or draw inferences favorable to the trial court's decision; we also do not independently resolve conflicts in the evidence. (*Id.* at p. 640 & fn. 4.) Under such independent review, the party seeking to uphold the trial court's defective order has the burden of persuasion. (*Oakland Raiders*, *supra*, 41 Cal.4th at pp. 640-641.) As our Supreme Court explained, the burden is on the party who moved for a new trial "'to advance any grounds stated in the motion upon which the order should be affirmed, and a record and argument to support it' [citation] and to persuade the reviewing court that the trial court should have granted the motion for a new trial. Thus, the effect of the trial court's failure to file a statement of reasons in support of the order granting a new trial is to shift the burden of persuasion to the party seeking to uphold the trial court's order." (*Id.* at pp. 640-641.) Thus, it is Olar's appellate burden to show the grounds upon which she is entitled to a new trial.

24.

On appeal, Olar presents arguments on two potential grounds for a new trial that are open for our review: (1) irregularity in proceedings based on the purported misconduct of Miller's trial counsel in questioning the defense's expert witnesses; and (2) error in law based on the trial court's denial of Olar's request for an Evidence Code section 402 hearing on the admissibility of the defense experts' testimony. Miller contends the trial court's express denial of the new trial motion on these grounds precludes us from affirming the order granting the new trial. Olar, however, has appealed from the judgment, which allows her to challenge the denial of the new trial motion. (*Walker v. Los Angeles County Metropolitan Transp. Authority* (2005) 35 Cal.4th 15, 18 [an order denying a motion for new trial may be reviewed on appeal from the underlying judgment].) The standard of review of a denial of a new trial motion is de novo, which requires the appellate court to review "'the entire record, including the evidence, so as to make an independent determination whether the error was prejudicial.'" (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417, fn. 10; *Young v. Brunicardi* (1986) 187 Cal.App.3d 1344, 1348.)[4]

Since the standards of review are the same whether Olar is arguing the grant of a new trial should be affirmed or challenging a denial of the new trial motion, i.e. they both call for de novo review, we need not decide which applies here. Instead, we address Olar's contentions in turn.

---

[4] In such a review, we accept the trial court's credibility determinations and findings of historical fact if they are supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (*Nesler*).) Thus, while the *trial court* may grant a new trial where the judge believes the evidence supporting the verdict is unreliable (see *Moore v. City & County of San Francisco* (1970) 5 Cal.App.3d 728, 738), we do not independently resolve issues of credibility

*Misconduct of Counsel*

Olar contends she is entitled to a new trial on the ground of irregularity in the proceedings based on misconduct of Miller's trial counsel. Olar asserts Miller's counsel committed misconduct when he asked the defense experts during direct examination questions that referred to or elicited responses in violation of a motion in limine to which Miller's counsel had stipulated.

Before trial, Olar brought a motion in limine to (1) preclude Miller, his expert witnesses and his attorney "from making any mention of, or reference to the content, either specifically or generally, of any medical text, journal article, or 'literature' on direct examination"; (2) instruct defense witnesses they are precluded from offering or volunteering any testimony relating to the same; and (3) preclude defense counsel "from asking any questions, to the effect, 'Are you familiar with the body of literature that stands for the proposition or supports the proposition. . . .'" The motion was based on the legal principle that an expert's recital, on direct examination, of information contained in scientific and medical publications and journals is hearsay and therefore inadmissible. (See, e.g., *People v. Campos* (1995) 32 Cal.App.4th 304, 308 [on direct examination, an expert witness may state the reasons for his or her opinion and testify that the opinion is based on reports prepared by other experts, but may not reveal the content of the prepared reports or the opinions expressed by nontestifying experts].) At the pretrial proceedings, defense counsel stipulated to the motion and stated the motion was "mutual."

Olar asserts defense counsel violated this in limine motion in his questioning of the defense's expert witnesses and thereby committed misconduct. She first points to testimony by gynecologist Martin Feldman, M.D., on direct examination by defense counsel, in which the doctor was asked to explain the risks associated with a hysterectomy, whether those risks were inherent risks, why they were considered inherent risks, and whether those risks could occur in the absence of negligence by the surgeon. Feldman responded that the risks of a hysterectomy were infection, bleeding and injury to

26.

adjacent structures, including the bladder; these were inherent risks because the surgeon is working very closely to the adjacent structures which can be injured during the procedure despite "all efforts"; and the risks could occur in the absence of negligence. Feldman further testified he did not know of any obstetricians who would not agree these were inherent risks of an abdominal hysterectomy and confirmed the correctness of defense counsel's hypothetical that if a thousand hysterectomies were performed, "statistically, it is predictable that a certain number of patients would experience one or more" of these inherent risks. When asked if this topic had been studied over the decades in medical schools and by physicians such as himself, Feldman responded that "we know the inciden[ce] of different types of injuries[,]" meaning how often it happens, and the incidence of vesico-vaginal fistulas was "commonly quoted at one percent." When asked if the "statistics that get reported vary from what applications you're looking at" at a given point in time, Feldman responded, "Absolutely." Defense counsel also asked Feldman what the known causes of fistulas are when a hysterectomy is performed.

Olar also cites testimony from uro-gynecologist Cynthia Hall, M.D., on redirect examination. There, defense counsel noted that plaintiff's counsel had asked her on cross-examination whether she had ever seen "in the literature" a patient who had a hysterectomy and was later found to have four fistulas and then asked Hall whether it mattered if there was one fistula or two "as far as the numbers are concerned, in terms of how it's reported in the literature." Hall responded that was what she was saying; "It's not reportable because it's not interesting enough. Sorry." When asked if "the literature talks about a patient with a fistula, it doesn't go on to define patients that have had one or have had two or more than one or two; is that fair?," Hall agreed it was fair. Hall also agreed with defense counsel that if "one looks at the literature, it wouldn't be a surprise to you if it didn't talk about patients in terms of the number of numbers of fistulas, it simply talks about the concept of the complication occurring; is that fair?"

27.

While attorney misconduct is a ground for a new trial (§ 657, subd. (1)), it can justify a new trial only if it is reasonably probable the party moving for a new trial would have obtained a more favorable result absent the misconduct. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870, 872; see also *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801–802 (*Cassim*).) Although we do not share the view that defense counsel engaged in misconduct, we will not resolve that issue because Olar did not object during trial when the alleged misconduct purportedly occurred. It is well settled that generally a party cannot complain on appeal of attorney misconduct at trial unless the party timely objected to the misconduct and requested that the jury be admonished. (*Whitfield v. Roth* (1974) 10 Cal.3d 874, 891–892 (*Whitfield*).) This gives the trial court an opportunity to remedy the misconduct and avoid the necessity of a retrial. (*Cassim, supra,* 33 Cal.4th at pp. 794–795; *Horn v. Atchison, T. & S.F. Ry. Co.* (1964) 61 Cal.2d 602, 610 (*Horn*).)

As recently summarized in *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1412 (*Rayii*): "The failure to timely object and request an admonition waives a claim of error unless the misconduct was so prejudicial that it could not be cured by an admonition (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000–1001; *Whitfield, supra,* 10 Cal.3d at p. 892), an objection or request for admonition would have been futile (*People v. Hill* (1998) 17 Cal.4th 800, 820) or the court promptly overruled an objection and the objecting party had no opportunity to request an admonition (*Cassim, supra,* at pp. 794–795). Attorney misconduct is incurable only in extreme cases. (*Horn, supra,* 61 Cal.2d at p. 610; see, e.g., *Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 351–355 (*Simmons*).)"

Olar did not timely object to the questions Miller's counsel asked or the testimony she now claims violated the in limine motion; neither did she request an admonition to the jury. Olar has not shown the purported misconduct was so persistent or egregious as to justify the conclusion it was incurable. We conclude Olar's failure to timely object and request an admonition to the jury precludes our consideration of the point on appeal.

(See *Rayii*, *supra*, 218 Cal.App.4th at p. 1412; *Menasco v. Snyder* (1984) 157 Cal.App.3d 729, 734 [on review of denial of motion for new trial, claim of attorney misconduct is waived if no objection and request for admonition is made at trial].)[5]

*Failure to Hold Evidence Code Section 402 Hearing*

Although not entirely clear, it appears Olar asserts a new trial should have been granted on the ground of error in law (§ 657, subd. (7)) because the trial court erroneously refused to hold an Evidence Code section 402 hearing to determine the admissibility of the opinion testimony of defense experts Feldman and Hall.

During trial, Olar filed a request for the trial court to hold an Evidence Code section 402 hearing to determine the admissibility of the doctors' opinions before they testified. Olar asserted the hearing was necessary to establish the factual basis for their opinions that four vesico-vaginal fistulas can occur in the absence of negligence or are an inherent risk of a hysterectomy, and whether Feldman could opine Miller complied with the applicable standard of care even though he did not have an opinion as to the cause of the four vesico-vaginal fistulas. Olar argued that, based on excerpts of the doctors' deposition testimonies, their opinions lacked sufficient foundation because neither doctor had ever had a patient develop vesico-vaginal fistulas after an abdominal hysterectomy or read about four such fistulas developing in a patient.

In his written opposition, Miller argued the request should be denied as unnecessary, since objections based on lack of foundation could be made during the witnesses' testimony and ruled on accordingly, and the deposition testimony Olar cited

_____

[5] Olar asserts her pretrial motion in limine to preclude testimony or questions concerning the content of publications on direct examination preserves her claim of attorney misconduct for appeal. We disagree, as the motion in limine could not substitute for a timely objection on the ground of misconduct. (See, e.g., *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 468 ["when confronted by misconduct of counsel an adversary generally must, first, object or otherwise direct the court's attention to the misconduct and, second, move for a mistrial to seek a curative admonition."]

29.

was incomplete and additional testimony showed the basis for the doctors' opinions. The trial court denied Olar's requested hearing after finding Olar's objections went to the weight to be given the doctors' opinions, not their admissibility, and noted that Olar's counsel could cross-examine the witnesses.

Olar contends the trial court's ruling is a prejudicial error of law. We disagree. Olar's request was made under Evidence Code section 402, subdivision (b), which provides, in pertinent part: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; . . ." Evidence Code section 402 is a procedure for the trial court to determine, outside the jury's presence, whether evidence is admissible. It is within the trial court's discretion whether to decide admissibility questions under Evidence Code section 402, subdivision (b) within the jury's presence. (*People v. Williams* (1997) 16 Cal.4th 153, 196.)[6]

The trial court here did not abuse its discretion in refusing to hold a hearing. It reasonably could conclude that Olar's objections, namely that the doctors could not opine four vesico-vaginal fistulas were an inherent risk of a hysterectomy and could occur without negligence because they had never experienced or read of such a complication, went to the weight, not the admissibility, of their opinions. An expert witness may offer an opinion that is "related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), and may base that opinion on matters outside his or her personal knowledge that are "of a type that reasonably may be relied upon by an expert in forming an opinion" on the subject at hand (Evid. Code, § 801 subd. (b)). (See, e.g., *People v. Catlin* (2001) 26

---

[6] Olar contends we should review the trial court's decision not to hold a hearing de novo, citing *In re Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563-564 and *Stephen v. Ford Motor Co.* (2005) 134 Cal.App.4th 1363, 1370. These cases, however, do not support the proposition that our review is de novo, as neither case addresses a decision to deny an Evidence Code section 402 hearing.

Cal.4th 81, 132-133 (*Catlin*) [a pathologist who performed an autopsy on the victim could opine the cause of death was paraquat poisoning based on a laboratory report prepared by other professionals despite never having performed an autopsy where that was the cause of death]; *Brown v. Colm* (1974) 11 Cal.3d 639, 643 [medical expert not required to have experience in the particular field of his or her testimony as long as expert demonstrates special knowledge of the subject matter]; *Conservatorship of Chambers* (1977) 71 Cal.App.3d 277, 285, fn. 13 ["Evidence Code section 801, subdivision (b), provides that an expert may base his testimony upon any matter which is a type upon which the expert may reasonably rely in forming an opinion.  There is no requirement of direct knowledge of given facts."].)

Moreover, Olar has not demonstrated the denial of an Evidence Code section 402 hearing was prejudicial, since she had the opportunity to object to the doctors' testimony during trial on the grounds of which she now complains and move to strike it, but failed to do so.

In sum, Olar has not met her burden of showing there is a basis for granting her a new trial.  Since the trial court had no jurisdiction to enter its statement of reasons for granting the motion on evidentiary grounds, we must reverse the order granting Olar a new trial.

## II.  Sufficiency of the Evidence

In her cross-appeal from the judgment, Olar asserts there is insufficient evidence to support the jury's verdict in favor of Miller, as Miller was negligent as a matter of law in both the manner he performed the hysterectomy and in performing an unnecessary hysterectomy.

### *Legal Principles*

Medical malpractice is a cause of action for professional negligence.  It is shown by demonstrating (1) the standard of care in the professional community, (2) the medical provider's failure to meet that standard, and (3) the patient's harm due to the medical

31.

provider's deficient care. (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1077.) With respect to the standard of care, "'[t]he law demands only that a physician or surgeon have the degree of learning and skill ordinarily possessed by practitioners of the medical profession in the same locality and that he exercise ordinary care in applying such learning and skill to the treatment of his patient. [Citations.] The same degree of responsibility is imposed in the making of a diagnosis as in the prescribing and administering of treatment. [Citations.]' [Citation.] 'The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman.'" (*Keen v. Prisinzano* (1972) 23 Cal.App.3d 275, 279.)

Olar asserts there is not substantial evidence to support the jury's finding that Miller was not negligent in her diagnosis and treatment. In making this assertion, Olar "is in fact claiming that [s]he proved negligence as a matter of law, and such is not established unless the only reasonable hypothesis is that negligence existed." (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.) In order for us to reverse the judgment on this ground, we would have to hold that "it would have been impossible from all the evidence for the jury to find" that Miller was not negligent or Olar had not met her burden to prove Miller was negligent. (*Byrum v. Brand* (1990) 219 Cal.App.3d 926, 947.) The issue of a defendant's negligence may be determined as a matter of law only if reasonable persons can draw but one conclusion from the evidence. (*Horn v. Oh, supra,* 147 Cal.App.3d at p. 1099.) "'Only where no fact is left in doubt and no deduction or inference other than negligence can be drawn by the [trier of fact] from the evidence can the court say, as a matter of law, that negligence is established. . . .'" (*Ibid.*)

Olar contends that she met this standard with respect to both acts upon which her negligence claim was based, namely the manner in which Miller performed the

hysterectomy and the decision to perform an unnecessary hysterectomy. We address each of these in turn.

*The Hysterectomy*

Olar contends she established Miller was negligent as a matter of law in the manner he performed the hysterectomy under the theory of res ipsa loquitur. She claims she satisfied her burden of proving the three elements of res ipsa loquitur, thereby establishing a presumption of negligence and shifting to Miller the burden of producing evidence to rebut the presumption, who failed to meet that burden. She concludes that therefore she was entitled to prevail.

In a medical malpractice action, a medical provider's negligence is not presumed but must be proved, except in cases where the doctrine of res ipsa loquitur applies. (*Lashley v. Koerber* (1945) 26 Cal.2d 83, 88-89.) When an accident or disagreeable consequence is so likely to have been caused by the defendant's negligence, it may fairly be said that "'the thing speaks for itself'" or, in Latin, res ipsa loquitur. (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 825 (*Brown*).)

The doctrine of res ipsa loquitur has been codified as "a presumption affecting the burden of producing evidence." (Evid. Code, § 646, subd. (b).) "The presumption arises when the evidence satisfies three conditions: '"(1) the [injury] must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff."'" (*Brown*, *supra*, 4 Cal.4th at pp. 825-826.)

"'[T]he applicability of the doctrine of res ipsa loquitur depends on whether it can be said, in the light of common experience, that the [injury] was more likely than not the result of [defendant's] negligence. [Citations.] "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply."'" (*Zentz v. Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 442 (*Zentz*).) "[I]t must appear . . . that the

[injury] is of a type which probably would not happen unless someone was negligent.  In the absence of such a probability there would be no basis for an inference of negligence which would serve to take the place of evidence of some specific negligent act or omission."  (*Zentz*, at pp. 442-443.)

"The fact that a particular injury rarely occurs does not in itself justify an inference of negligence.  (*Siverson v. Weber* [(1962)] 57 Cal.2d 834, 839.)  To allow an inference of negligence to be made solely based on this fact would place a disproportionate burden on the medical profession and would discourage the use of new procedures which may involve inherent risks even when due care is used.  (*Siverson v. Weber, supra,* p. 839.)  But evidence of rarity, together with some other evidence indicating negligence, may warrant a conditional res ipsa instruction, particularly where the injury resulted from a commonplace procedure rather than from a complex or unusual operation.  (*Clark v. Gibbons* [(1967)] 66 Cal.2d 399, 412-413; *Quintal v. Laurel Grove Hospital* [(1964)] 62 Cal.2d 154, 165-166 .)"  (*Hale v. Venuto* (1982) 137 Cal.App.3d 910, 918-919.)  A plaintiff is not absolutely required to explain how the injury happened.  """Res ipsa loquitur may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury."""  (*Id.* at pp. 919-920.)

When the doctrine applies, it creates an inference that the defendant's negligent conduct caused the accident or injury, imposing upon the defendant the obligation of going forward to rebut the inference.  (*Roberts v. Trans World Airlines* (1964) 225 Cal.App.2d 344, 352.)  The defendant's evidence need only offset or balance the inference of negligence; he need not prove himself free from negligence by a preponderance of proof.  (*Ibid*; see also *Williams v. City of Long Beach* (1954) 42 Cal.2d 716, 717-718; *Landerman v. Hamilton* (1964) 230 Cal.App.2d 782, 785.)  The defendant can rebut the inference either by (1) offering a satisfactory explanation for the injury, i.e. a definite, non-negligent cause, or (2) showing "such care in all possible respects as

34.

necessary to lead to the conclusion that the [injury] could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown." (*Ibid.*) A defendant also may attempt to rebut the inference through evidence the physician utilized medical procedures which involve an inherent risk of injury when due care is used. (*Bardessono v. Michels* (1970) 3 Cal.3d 780, 790, fn. 8.)

The question before us is whether Olar established the res ipsa conditions as a matter of law, thereby requiring a finding in her favor absent substantial evidence from Miller to meet or dispel the inference of negligence. The only disputed res ipsa condition was whether the development of four vesico-vaginal fistulas is the type of injury that probably would not occur as a result of an uncomplicated hysterectomy in the absence of negligence. Olar contends she established this as a matter of law because it was undisputed that: (1) Miller performed an uncomplicated hysterectomy on Olar that did not involve excessive bleeding; (2) as a result of the surgery, she suffered four vesico-vaginal fistulas; (3) the fistulas were caused by Miller putting sutures in Olar's bladder when he sewed the vaginal cuff closed; (4) the incidence of a patient developing four vesico-vaginal fistulas following a hysterectomy "has never happened before in the history of recorded medicine," as none of the expert witnesses had ever seen, heard of, or read about a patient developing four such fistulas after a hysterectomy, and none of their patients had ever developed even one vesico-vaginal fistula; (5) the standard of care requires a surgeon to completely and adequately remove the bladder off the vaginal cuff when performing a hysterectomy to prevent placing sutures in the bladder; and (6) the failure to completely remove the bladder off the vaginal cuff is below the standard of care.

In asserting these facts are undisputed, Olar ignores the contrary evidence from which the jury reasonably could have found Olar failed to prove her harm, i.e. the development of four fistulas following an uncomplicated hysterectomy, ordinarily would not have occurred unless someone was negligent. All of the experts, including Dubin,

35.

testified a vesico-vaginal fistula could develop following an uncomplicated hysterectomy with or without negligence. While Dubin opined that four vesico-vaginal fistulas should not happen without negligence, both Feldman and Hall opined that four such fistulas could develop without negligence. In Feldman's opinion, the number of fistulas is not determinative of whether they resulted from the surgeon's negligence, as a non-negligent mechanism, such as thinning of the bladder when taking it down or placing a suture in the bladder, could cause more than one fistula. Hall agreed with this opinion, explaining that she might conclude negligence was involved if the fistulas were all over the bladder, but not if they were all in the same area. Feldman criticized Dubin's opinion, explaining it made no sense to him that Dubin would not have a standard of care criticism of Miller if only one fistula developed but would believe he acted below the standard of care due to the presence of four fistulas.

Thus, the jury could have concluded that the mere presence of four fistulas did not indicate negligence. Olar contends the res ipsa inference is required because she showed as a matter of law that the injury she suffered has never happened before and presented evidence of a negligent cause, i.e. sutures in the bladder when sewing the vaginal cuff. (See, e.g., *Clark v. Gibbons* (1967) 66 Cal.2d 399, 412 [an inference of negligence may arise under the doctrine of res ipsa loquitur where there is evidence of a low incidence of injury when due care is used combined with proof of specific acts of negligence of a type which could have caused the injury at issue].)

Olar, however, did not prove that sutures were the cause of her fistulas as a matter of law. Although Dubin opined suturing was the only way one could possibly get four fistulas, which occurred by failing to provide adequate separation between the bladder and vaginal cuff, not all of the experts agreed. Feldman testified he could not say to a reasonable medical probability which of the four causes of vesico-vaginal fistulas led to Olar's fistulas. While Olar asserts Hall definitively testified sutures caused the fistulas, Hall actually testified that was her "best guess" as to the cause. From Feldman's

testimony, the jury could have rejected Dubin's testimony that sutures were in fact the cause, found the cause was unknown and, on that basis, attribute the injury to the non-negligent causes Hall and Feldman testified could occur during a hysterectomy. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 204 (*Ackerman*) ["'resolution of conflicts in the evidence, assessment of the credibility of witnesses and the weight to be given the opinions of experts were all matters within the exclusive province of the trier of fact.'"].) Given that there was evidence that the bladder had thinned, the jury could find that thinning was a reasonable, non-negligent explanation for the fistulas.

Moreover, even if the jury accepted that suturing caused the fistulas, the defense experts both opined that placing sutures in the bladder was not necessarily below the standard of care. As Hall testified, a surgeon exercising reasonable care during a simple hysterectomy can put sutures into the bladder while sewing the vaginal cuff because "[c]omplications occur in surgery[,]" and while a surgeon does his or her best to avoid injuring the bladder and tries to get the stitches away from the bladder, 0.5 percent of simple hysterectomies will result in a fistula. Feldman testified placement of sutures in the bladder wall is a recognized risk of an abdominal hysterectomy and could occur in an uncomplicated hysterectomy without negligence because, while surgeons try to be "very careful" and identify what is being sewn, a surgeon could believe the bladder is completely clear and "for one reason or another" be wrong.

Olar contends the jury was required to reject the testimony of Hall and Feldman because their opinions were conclusory and not supported by the evidence. Olar asserts the defense experts never adequately explained why a single vesico-vaginal fistula or multiple vesico-vaginal fistulas due to sutures in the bladder were inherent risks of an uncomplicated hysterectomy.

Expert opinions are purely conclusory if they are not accompanied by a reasoned explanation that connects the factual predicates to the ultimate conclusion, thus having no evidentiary value. (See *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114

Cal.App.4th 1108, 1117.) Hall's and Feldman's opinions regarding the inherent risks of a hysterectomy were grounded in their training as physicians and their knowledge of the medical literature concerning the risks inherent in hysterectomies, which provided a reasonable basis for their opinions. Feldman explained the risks were inherent because the structures a surgeon is dealing with are very close together and can be injured during the surgery without negligence, and a suture can be placed in the bladder without negligence because a surgeon can believe the bladder is cleared when in fact it is not. Hall explained that fistulas can occur in the absence of negligence during mobilization of the bladder while separating it from the vagina, and a suture can be placed in the bladder without negligence because a surgeon could believe he or she was in the right plane, when in fact the surgeon was not. Thus, each doctor provided an explanation for their opinions. It was up to the jury to decide whether to accept or reject those opinions. (See *Ackerman*, *supra*, 146 Cal.App.4th at p. 204.)

While Olar asserts these opinions must be disregarded because the doctors had never seen or read about a patient developing four vesico-vaginal fistulas, as we have previously explained, the lack of personal experience did not invalidate their opinions; the defense experts could testify from their education and training as to the potential causes of vesico-vaginal fistulas and the possibility of one or more of them developing during an uncomplicated hysterectomy. (See *Catlin*, *supra*, 26 Cal.4th at pp. 132-133; *Brown v. Colm*, *supra*, 11 Cal.3d at p. 643.) Because the defense experts' opinions are not based on unsupported factual assumptions or sheer speculation and conjecture, we reject Olar's argument that their opinions must be rejected.

Olar asserts an inherent risk cannot be a hypothetical injury; it must be an actual result that is known to have occurred in the absence of negligence. But the authority she cites, *Gerhardt v. Fresno Medical Group* (1963) 217 Cal.App.2d 353, 359 (*Gerhardt*), does not support her assertion. *Gerhardt* merely states that where there is no medical testimony that the injury at issue is a calculated risk inherent in the surgery, evidence that

38.

the injury is extremely rare is determinative of the application of res ipsa loquitur. (*Ibid.*) Here, there was medical testimony that, even though the development of one or more fistulas was an extremely rare occurrence, it was an inherent risk of a hysterectomy.

At best, Olar's appellate argument explains how a jury *could have* found in her favor on the issue of Miller's negligence, namely by accepting Dubin's testimony that the fistulas were caused by the placement of sutures in the bladder, which was below the standard of care. But given the defense experts' testimony as to non-negligent causes of vesico-vaginal fistulas and that placing sutures in the bladder is not always below the standard of care, she did not establish this as a matter of law. A rational fact finder could have chosen to discount Dubin's testimony and instead accept the testimony of Hall and Feldman. While Olar would like us to reject the defense experts' testimony, on appeal we cannot reweigh the evidence and we do not consider their testimony so inherently lacking in credibility as to be unworthy of consideration. "The testimony of witnesses who were apparently believed by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions." (*DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 195.) At most the record before us reveals the presentation of contrary evidence by Olar, which does not subject Hall's or Feldman's testimony to repudiation or doubt. (*Ibid.*) Olar simply has not proven res ipsa applies as a matter of law.

Because the jury rationally could have concluded that Olar failed to establish the first res ipsa condition, it was not obligated to apply the res ipsa presumption. Olar asserts the jury could not disregard the inference of negligence she established, citing *Druzanich v. Criley* (1942) 19 Cal.2d 439 (*Druzanich*), and *Gerhardt, supra,* 217 Cal.App.2d 353. In these cases, the evidence on the existence of the res ipsa elements was not conflicting, thereby necessitating a finding for the plaintiff as a matter of law. (See *Druzanich*, *supra*, 19 Cal.2d at pp. 444-445 [judgment for defendant reversed in negligence action arising from automobile accident where, under the res ipsa loquitur

doctrine, an inference of negligence arose from evidence that the accident would not have happened if the defendant had used proper care, and the defendant's testimony indicated a lack of due care on her part, thereby necessitating a finding of negligence in accordance with the inference]; *Gerhardt*, *supra*, 217 Cal.App.2d at p. 361 [where the facts giving rise to the res ipsa loquitur doctrine are undisputed, the inference of negligence arises as a matter of law].) These cases are not controlling here, where there was conflicting evidence on the existence of the first res ipsa element.

Olar contends she was entitled to prevail because Miller did not produce evidence that dispelled the inference of negligence, such as identifying the precise cause of her injury or establishing he was not negligent in any respect. All presumptions must be drawn in favor of the jury's verdict. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) We must presume the jury rejected Olar's res ipsa argument on the ground she failed to establish the first res ipsa condition. Consequently, it is irrelevant whether Miller produced evidence sufficient to rebut presumption.

Finally, Olar contends the trial court erred in instructing the jury with the second and third elements of res ipsa loquitur because those elements were established as a matter of law, citing *Rimmele v. Northridge Hosp. Foundation* (1975) 46 Cal.App.3d 123, 130. The jury here was instructed on res ipsa loquitur pursuant to CACI No. 518, an instruction that Olar herself requested and which included all three res ipsa elements. During the jury instruction conference, Olar did not withdraw the instruction or object to it.

Under the doctrine of invited error, a party in a civil case may not complain of error in instructions that she has requested. (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131; *Stevens v. Owens-Corning Fiberglass Corp.* (1996) 49 Cal.App.4th 1645, 1653.) "The invited error doctrine is based on estoppel. '"Where a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal" on appeal.'" (*Huffman v. Interstate Brands Corp.* (2004)

121 Cal.App.4th 679, 706, italics omitted.)  The jury was instructed properly on the elements of res ipsa loquitur.  Because Olar requested the res ipsa instruction and failed to request modification in the manner she now complains of, she is estopped from asserting or has forfeited the issue.

*Unnecessary Hysterectomy*

Olar also contends she established Miller was negligent as a matter of law for performing an unnecessary surgery.  She asserts she is entitled to prevail because the testimony of Dubin and Feldman established that (1) "[t]he only indication for hysterectomy is failure of medical management[,]" (2) Olar did not have a failure of medical management, and (3) more likely than not, her bleeding would have been resolved successfully with medical management.

Feldman, however, testified that giving Olar the option of a hysterectomy when her bleeding returned in June 2008 was within the standard of care since she declined hormonal therapy.  In contrast to Dubin's opinion that the hysterectomy was not indicated because Olar had not failed medical management, Feldman opined the hysterectomy was indicated as her irregular bleeding meant she was a candidate for the operation, especially since she declined any other management.  As Feldman explained, it was Olar's right, once she was informed of the options, to choose whether to have the hysterectomy.

While Olar recognizes Feldman's testimony on this point, she asserts the evidence shows, as a matter of law, that Miller did not provide Olar with truthful and accurate information to allow her to make an informed decision.  In support, she cites her own testimony that Miller told her she would have to take Provera for the rest of her life, Provera probably would not work, and she would have a rapid 20 to 30 pound weight gain on Provera, and points out that Miller never directly denied making any of these statements to her.  She also asserts that if Miller discussed an endometrial ablation with her, he erroneously told her she was not a candidate for it.

41.

Miller, however, testified he discussed hormonal therapy with Olar before both the D & C and the hysterectomy, and Olar declined the therapy. He further testified that during such discussions, he would have told her she might be on hormones until menopause and that Olar understood the hormone causes weight gain. Miller, however, did not know the source of Olar's belief that she would gain 25 pounds. Although Miller did not think Olar was a candidate for endometrial ablation, it was unclear from his testimony whether he told her that. For example, he testified at his deposition that he believed she was not a candidate, but when asked what he said to Olar about ablation, he responded, "I don't recall that she wasn't a candidate for it." According to Miller, while he discussed Olar's options with her at the June 2008 consultation, including hormonal treatment and an ablation, Olar wanted a hysterectomy.

Based on Miller's testimony, which the jury could have accepted over Olar's, the jury reasonably could have found Miller truthfully and accurately disclosed the risks and benefits of hormonal therapy and ablation. The jury could then have concluded that, based on Feldman's opinion on the standard of care, Miller was not negligent, i.e. did not act below the standard of care, in offering Olar the option of having a hysterectomy and performing the operation. Since the trier of fact determines the credibility of witnesses (*McAllister v. George* (1977) 73 Cal.App.3d 258, 265), and all presumptions must be drawn in favor of the jury's verdict (*Denham*, *supra*, 2 Cal.3d at p. 564), we must presume the jury rejected Olar's testimony and Dubin's opinion regarding the standard of care, and instead accepted Miller's testimony and Feldman's opinion on this issue. Accordingly, Olar has failed to show that she was entitled to a negligence finding as a matter of law.

## DISPOSITION

The order granting Olar's motion for a new trial is reversed. The judgment is affirmed. The trial court is directed to reinstate the judgment. Miller is entitled to his costs on appeal.

_____

Gomes, Acting P.J.

WE CONCUR:

_____

Poochigian, J.

_____

Detjen, J.